SCHWEIDLER, Plaintiff, vs. CARUSO and another, Defendants and Appellants: EARL, Defendant and Respondent.

*March 8—April 5, 1955.*

440'

For the appellants there was a brief by *Jeffris, Mouat, Oestreich, Wood & Cunningham,* and oral argument by *Harry F. Knipp* and *Louis D. Gage, Jr.,* all of Janesville.

For the respondent there was a brief by *Toebaas, Hart, Kraege & Jackman* of Madison, and oral argument by *Lawrence E. Hart.*

STEINLE, J. This controversy results from a collision between an Oldsmobile passenger automobile driven by John W. Earl and owned by Richard Schweidler, who was riding in it at the time, and a one-and-one-half ton Dodge delivery truck driven by Sam F. Caruso, on a north-south, straight, stretch of roadway on Highway 51, about a mile out of Edgerton toward Madison on the afternoon of September 6, 1951. The road was of concrete, 20 feet in width, and shoulders six to seven-and-a-half-feet wide extended from the pavement. Both vehicles were traveling in a northerly direction. The truck was ahead of the passenger car. Earl intended to pass the truck to its left. The collision occurred as the driver of the truck made a left turn toward a private driveway.

Schweidler, sixty-six years of age, a painting and decorating contractor, of Hinsdale, Illinois, and Earl, fifty years old, operator of a Chevrolet garage there, were on a trip to Rainy Lake in Canada where they intended to go fishing. They were a part of a group of businessmen from their own locality who had planned to stay at a camp there. The others were to follow on the next day. The trip was purely for pleasure. Neither transacted or intended to transact any business on the trip. There had been no discussion or agreement prior to the start of the trip or thereafter as to payment of expenses. At the trial Schweidler testified that he did

not anticipate that Earl would pay a part of the expense of operating the car, and Earl testified that he expected that the expenses would be on a "Dutch treat" basis.

Before starting from Hinsdale at about 1:30 p. m. (daylight saving time), no plans had been made regarding the driving. After commencing the trip there was some discussion about driving, and they decided to "change off." There was no agreement as to what part of the driving either would do. Earl was more familiar with the roads than was Schweidler. Schweidler drove the car as far as Lake Geneva or Janesville (there is a variance in the testimony as to the exact place), when Earl suggested that he drive. They exchanged places in the front seat, and Earl drove the car until the time of the collision. Schweidler made no suggestion as to how Earl was to drive the car, and gave him no directions or instructions. After Earl took over the driving, Schweidler "relaxed and took it easy," and dozed part of the time, and had been dozing for a while until a few moments before the collision. Earl drove at the same rate of speed that Schweidler had,—about 60 miles per hour. The speed was satisfactory to Schweidler. He was not worried about Earl's driving. He made no protest and saw no occasion to do so. There was no definite destination that was intended to be reached that day.

The truck driven by Caruso was equipped with rear-view mirrors, one on each side (fastened to the door near the windshield). Caruso testified that although the cab of the truck had a rear window, one could not see through it behind the truck because of the presence of acetylene tanks as part of the load on the truck.

With reference to other particulars, Caruso testified that he was proceeding at a speed of about 25 to 30 miles per hour after leaving Edgerton. The road was clear. He passed no vehicles. A school bus left Edgerton at about the same time he did. It followed behind him at a distance of about

50 to 100 feet. He observed it through the rear-view mirror. While the presence of the bus obstructed his view of traffic behind and in the lane of the bus, he had a view all the way back in the left (west) lane of traffic. When about 300 feet from the driveway entrance of Midway Welding Company (where he intended to stop), he looked back and saw only the bus. When a little more than 150 feet from the driveway of the welding company he looked again and saw only the bus. When about 25 to 30 feet south of the entrance to the driveway (which driveway is about 10 to 12 feet wide) he glanced in the rear-view mirror, saw the bus behind him at a distance of 50 to 75 feet, and made a "pretty sharp" turn from the lane (east) where he had been traveling, taking his foot off the gas feed at the time. His left directional light had been turned on and was working. His truck was three-quarters way into the driveway at the time of impact.

Evidence was offered by Earl that he followed a school bus out of Edgerton, and after passing the city-limits sign, the school bus was preceded by one or two cars and Caruso's truck, with the truck in the lead. While following behind the bus, Earl was driving at a speed of 30 to 35 miles per hour. He intended to pass all of these vehicles. He accelerated his speed to 60 to 65 miles per hour, overtook the bus and the other cars, and when the car that he was driving was about 50 feet behind the truck and in the left (west) lane, the truck suddenly and without signal made a sharp left turn from the right (east) lane toward the direction of the driveway. He applied his brakes and attempted to turn to the right side of the road. The left front wheel of the truck was off the pavement at the time of impact, and the rear of the truck was still partly east of the center line of the highway. He had not sounded his horn. The car struck the rear of the truck at about its center point. It appeared that his car did not move after the impact.

By a special verdict the jury determined that Earl was causally negligent as to management and control, speed, lookout, and as to giving an audible warning of his intention to pass. Caruso was found causally negligent with respect to the manner of turning his truck into the driveway under the circumstances then and there present, but not negligent as to giving an appropriate warning signal of his intention to turn. The jury compared the negligence of the parties and determined that 80 per cent was attributable to Earl and 20 per cent to Caruso.

Appellants' first contention is that Earl's negligence is to be imputed to Schweidler for the reason (1) that their enterprise was a joint adventure, and (2) that Earl was acting as Schweidler's agent.

From the facts it appears that both Earl and Schweidler were on a pleasure trip at the time of the collision. Each was making the trip for his own pleasure. Neither intended to transact any business on the trip. It appears that there was no prearrangement for a substantial sharing of the expenses.

Appellants rely upon the principle stated in Restatement, 2 Torts, p. 1273, sec. 491, that:

"Any one of several persons engaged in an enterprise is barred from recovery against a negligent defendant by the contributory negligence of any other of them if the enterprise is so far joint that each member of the group is responsible to third persons injured by the negligence of a fellow member."

However, respondent invites attention to comment *c* under sec. 491, p. 1274, Restatement, 2 Torts, *supra,* where it is said that:

". . . if there is no prearrangement for a substantial sharing of the expenses of the trip, . . . the trip is not a joint enterprise merely because it is made at the request of the

plaintiff, because he and his host have a common destination, because the destination or any change therein is to be determined by mutual agreement, because it is arranged that the guest is to drive alternatively with his host, or even because they are going to the common destination to accomplish a purpose in which they have a common but not a business interest. No one of these facts, nor indeed all of them together, is sufficient to justify a jury or other trier of fact in finding that the trip was a joint enterprise."

In 38 Am. Jur., Negligence, p. 940, sec. 249, it is declared that:

"The occupants of a vehicle on pleasure bound are not, because of their common objective, engaged in a common enterprise so as to make the driver of the vehicle the agent of all, with consequent responsibility for his negligence."

In this state it has been established that ordinarily the relationship of joint adventurers does not arise out of social relations, but grows out of financial or business enterprises and springs from contract. In *Krause v. Hall* (1928), 195 Wis. 565, 217 N. W. 290, the occupants of the automobile involved in the collision were returning from a dance. This court held that they were not engaged in a joint adventure. Specifically, the court said (p. 571):

"It is also suggested that plaintiff and defendant were engaged in a joint adventure, and that his negligence was imputable to her. The relation of joint adventurers is generally contractual in its nature. . . .
"It is plain that plaintiff and defendant were not joint adventurers in the sense that the negligence of one will be imputed to the other."

In *Sommerfield v. Flury* (1929), 198 Wis. 163, 223 N. W. 408, the members of a threshing crew entered an automobile for the purpose of proceeding to a fire in the neighborhood and with the intention of rendering assistance. It was customary for neighbors to assist in such emergency. This

court found that such enterprise was not a joint adventure. In the opinion of that case, Mr. Justice Owen, speaking for the court, said (p. 166):

"The ordinary conception of a joint undertaking is that it grows out of a financial or business enterprise, and springs from contract. . . . Our attention has been called to a few scattering cases where courts have considered relations purely social in their nature as giving rise to a joint undertaking. We believe such conclusions were reached without giving due consideration to the true character of a joint enterprise, as the same is known in the law. We have said in *Krause v. Hall,* 195 Wis. 565, 217 N. W. 290, that the relations of joint adventurers do not arise out of social relations. We are still of that opinion."

In *Van Gilder v. Gugel* (1936), 220 Wis. 612, 265 N. W. 706, the parties were returning home in an automobile after having assisted each other in cutting wood on their respective wood lots. It was held that no joint adventure existed. The following comment by the court is found at page 621 in the opinion of the case:

"Although each had a similar purpose in making the trip, it did not involve any joint financial interest to them, nor the performance of any joint duty on their part. Because of the complete absence thereof, there is no factual basis upon which to hold that they were engaged in a joint adventure or enterprise, . . ."

Appellants seek a reconsideration of the principle announced in *Sommerfield v. Flury, supra,* with respect to joint adventures. This principle was approved in *Fischbach v. Wanta* (1933), 212 Wis. 638, 250 N. W. 387; *Hahn v. Smith* (1934), 215 Wis. 277, 254 N. W. 750; *Canzoneri v. Heckert* (1936), 223 Wis. 25, 269 N. W. 716; and *Brabazon v. Joannes Brothers Co.* (1939), 231 Wis. 426, 286 N. W. 21. We are aware of no compelling reason for a change of the rule which has been so well established.

Appellants' next contention is that notwithstanding that Earl and Schweidler may not have been engaged in a joint enterprise, nevertheless, Earl was driving on behalf of Schweidler, and the negligence of Earl must be imputed to Schweidler.

Before the case was submitted to the jury, appellants had requested the inclusion of a question in the special verdict, which read: "At the time of this accident, was the defendant John Earl operating the automobile of Richard Schweidler as the agent of Richard Schweidler?" The court denied the request. Appellants' motions after verdict did not include a claim that the court erred in failing to submit the agency question to the jury. Appellants moved "that the court find as a fact that, at the time of the accident or collision involved herein, the defendant, John W. Earl, was driving the automobile . . . in plaintiff's behalf as his agent." Such motion in effect was a request that the court determine the question of agency. In its order on motions after verdict, the court determined that the relationship of principal and agent did not exist as between Earl and Schweidler. The finding in this regard is supported by credible evidence. It is not contrary to the great weight and clear preponderance of the evidence.

Ownership of an automobile raises a presumption which may justify an inference that the driver was the owner's agent. *Hahn v. Smith* (1934), 215 Wis. 277, 254 N. W. 750. However, a person may be a guest in his own automobile. *Reiter v. Grober* (1921), 173 Wis. 493, 181 N. W. 739. In the instant case there is ample evidence which justified the trial court in concluding that Schweidler had relinquished control of the car to Earl, and that the presumption of agency, because of ownership of the car in Schweidler, had been overcome.

The situation here present is comparable to that in *Smalley v. Simkins* (1927), 194 Wis. 12, 215 N. W. 450, where it

had been agreed that the driver and the owner would drive "half way" on the trip. The court said (p. 14):

"If appellant [Simkins] had loaned his car to Mr. and Mrs. Smalley for the purpose of this trip and had not accompanied them, there would have been a plain case of mere bailment and no liability in the owner, as bailor, for the negligence by the bailee in the driving of the car. . . . That Simkins drove the car part way and was riding in the front seat at the time of the accident does not present any substantially different situation. Each of the men was an experienced driver, and appellant, Simkins, at no time undertook or assumed to direct, as principal, the defendant Smalley as driver. . . . In substance Simkins was loaning the use of his car to the Smalleys, and the two supplied their own driver at that portion of the journey."

It was Earl, not Schweidler, who requested that Earl drive. Schweidler had not undertaken or assumed to direct Earl's driving of the car. Earl's driving was satisfactory. Earl knew the roads, Schweidler relaxed. The parties were in the relationship of bailor and bailee and not that of principal and agent at the time of the collision, and hence Earl's negligence is not imputable to Schweidler.

The other question presented upon this appeal involves the consideration of whether there is credible evidence that Caruso was causally negligent with respect to "the manner of turning his truck into the driveway under the conditions then and there existing."

Sec. 85.16 (2), Stats., provides that:

"The operator of a vehicle upon a roadway shall not deviate from the traffic lane in which he is operating without first ascertaining that such movement can be made with safety to other vehicles approaching from the rear."

The provisions of this statute apply to the *entire roadway*. *J. W. Cartage Co. v. Laufenberg* (1947), 251 Wis. 301, 28

N. W. (2d) 925. Manifestly, in order to comply with the statute, a driver is obliged to make an efficient observation to the rear. Despite Caruso's testimony that he made several such observations, he admits that he did not see the car driven by Earl at any time before the collision. This court has repeatedly held that when one looks and does not see what is in plain sight, he is in the same situation as one who does not look. *Lake to Lake Dairy Co-operative v. Andrews* 1953, 264 Wis. 170, 58 N. W. (2d) 685; *Schoenberg v. Berger* (1950), 257 Wis. 100, 42 N. W. (2d) 466.

The evidence respecting events that occurred immediately preceding the collision is in conflict. The weight and credibility of it were for the jury. We may not disturb the finding under attack. We are obliged to conclude that there is no valid basis for a reversal of the judgment.

*By the Court.*—Judgment affirmed.