NESSLER, Respondent, v. NOWICKI and another, Appellants.*

*January 9—February 7, 1961.*

\* Motion for rehearing denied, with $25 costs, on April 4, 1961.

For the appellants there was a brief by *Kivett & Kasdorf,* attorneys, and *Nonald J. Lewis* of counsel, all of Milwaukee, and oral argument by *Mr. Lewis.*

For the respondent there was a brief by *Eisenberg & Kletzke,* attorneys, and *John W. Bernard* of counsel, all of Milwaukee, and oral argument by *Sydney M. Eisenberg.*

BROWN, J.   The appellants contend that the evidence does not sustain the jury's answers.

Nessler was twenty-one years old at the time of the accident.  He was alone in the automobile which a friend had lent him.  He testified that just before and at the time of the

accident he was proceeding west on Layton avenue at a speed of 25 to 28 miles per hour. The speed limit there was 30 miles per hour. Nessler said that as he approached the intersection of Layton avenue and Pine street, he saw the bus coming north from the parking lot and, without stopping at the stop sign, go across Layton avenue to go north on Pine street. When Nessler saw this happen he was unable to avoid striking the bus because when he attempted to go behind the bus, permitting the bus to cross ahead of him, this took him over into the south half of Layton avenue and he was there faced by an eastbound automobile. That required Nessler to turn back into the north half of the highway and he could not then get by the rear end of the bus. The bus driver, Nowicki, testified that he first saw Nessler's car when the bus had reached the center of Layton avenue and he did not see that car again until just before the collision occurred. This evidence supports the jury's answer that Nowicki was negligent in lookout and that such negligence was causal. The lookout was inadequate to inform Nowicki that a collision would result if the two automobiles kept their respective speeds and courses. The testimony also supports the answer that Nowicki was negligent in failing to yield the right of way to Nessler. Plaintiff had right of way under sec. 85.18 (1) and (4), Stats. 1955, as follows:

"(1) *Right of way at intersections.* When two vehicles approach or enter an intersection at approximately the same time, the driver of the vehicle on the left shall yield the right of way to the vehicle on the right, except as otherwise provided in this section. The driver of any vehicle driving at an unlawful speed shall forfeit any right of way which he might otherwise have hereunder.

"(4) *Vehicles stopping for arteries for through traffic.* The operator of a vehicle shall stop as required by sec. 85.69 before entering an artery for through traffic, and shall yield the right of way to other vehicles which have entered or

are approaching the intersection upon the artery for through traffic."

There is no testimony that the parties made any material alteration in their speeds after they were in view of each other. We have interpreted that part of the statute which refers to vehicles entering an intersection at "approximately" the same time in *Vogel v. Vetting* (1953), 265 Wis. 19, 26, 60 N. W. (2d) 399:

" 'By *approximately,* the legislature must have meant the approach to an intersection of two vehicles so nearly at the same time that there would be imminent hazard of a collision if both continued the same course at the same speed. In that case, he on the left should yield to him on the right. While the driver on the left is not required to come to a dead stop, as at a through highway stop sign, unless it is necessary to avoid a collision, he nevertheless must approach the intersection with his car so under control that he can yield the right of way to a vehicle within the danger zone on the right. Such must have been the legislative intent. Other states having the same statutory provisions have supported this interpretation.' "

In *Kraskey v. Johnson* (1954), 266 Wis. 201, 206, 63 N. W. (2d) 112, we treated the same situation more specifically:

"As to whether the vehicle from the right, of two vehicles approaching each other at a highway intersection, has the right of way over the other vehicle is not determined by which enters the intersection first. Under our decision in *Vogel v. Vetting* (1953), 265 Wis. 19, 25, 26, 60 N. W. (2d) 399, the test of whether they are approaching 'at approximately the same time' under the statute is rather whether there 'would be imminent hazard of a collision if both continued the same course at the same speed.' "

The learned trial court cited both the above cases and correctly applied them to the present situation. It seems clear

to us that the collision was inevitable when the parties made no material alteration in their courses and speeds.

Appellants ask that the court disregard the jury's answers or change them because Nessler's testimony was contradicted by witnesses for the defendants and, moreover, Nessler himself was impeached on other material issues. Nessler testified that the bus did not stop at the stop sign before entering the arterial highway, whereas two employees at different service stations at the intersection testified that they saw the bus stop at that place. That was testified to also by another disinterested witness, Immel. Immel also testified that he was driving west on Layton avenue approaching the Pine street intersection, and was overtaken and passed by Nessler within a few blocks of the intersection. Immel said that he himself was driving at 30 miles per hour and Nessler passed him at a high rate of speed, which Immel estimated was 50 miles per hour. (Nessler's estimate was a maximum of 28 miles per hour.)

Ordinarily we would consider these discrepancies to be no more than the usual conflicts of testimony of opposing witnesses which are to be resolved by the jury. Presently, this is more serious because of the demonstrated unreliability of Nessler's testimony in other respects. Nessler was a soldier stationed at an air base at Salina, Kansas. He had procured a four-day pass to leave the post but his pass limited him to a radius of 300 miles from Salina. Notwithstanding, he went to Milwaukee which is 700 miles from Salina, and there, on the next to the last day of his leave, he had this accident. Nessler was thrown out of his automobile and received head injuries from striking the pavement. He was taken to the Johnson Hospital at Milwaukee and a number of stitches were taken in his scalp and forehead. He also had numerous bruises. Nessler realized that he had to get back to Salina the next day so he refused to stay in the hospital for further

treatment, Before leaving Milwaukee he saw his family physician, Dr. Kozina. Just what happened there is not clear. Dr. Kozina did not attend the trial. At any rate, Nessler quickly caught a train back to Salina and arrived there before the expiration of his leave. When he reached Salina he entered the base hospital and informed the doctors in attendance that he had fallen on some stairs and hurt his head in Kansas City. He gave them a medical history in which he stated that he had had migraine headaches most of his life. The doctors treated him for a few days as an outpatient and he was then released. In May of 1958, Nessler was discharged from military service, and on June 11, 1958, he applied for employment at American Motors Corporation in Milwaukee. In his application he informed the company that he had been in an automobile accident in March, 1957 (this one), where his head had been cut open and he had had headaches. He listed no other injuries or disabilities. He was employed there to load and unload trucks and has been able to perform the work assigned to him. He testified that the headaches of which he now complains do not interfere with his work. He played football during the fall of 1958, playing the positions of guard, tackle, and line backer. He hurt his knee in a football game but had no head injuries in football.

At the trial, and also before a court commissioner before trial, Nessler testified that he had never had any injury of any kind to his head except in this automobile accident. He was then confronted by a Milwaukee circuit court record which showed that on June 29, 1953, he was injured in an automobile collision in which he sustained "multiple lacerations of scalp, abrasions, and cerebral concussion." He and his guardian *ad litem* obtained a settlement, approved by the circuit court on October 23, 1953, for the injuries so sustained.

At the trial Nessler testified that he has frequent headaches which are sharp at first and then merge into a dull pain that remains until he uses medication.

Nessler called a medical witness, Dr. Fox, whom Nessler had consulted shortly before the trial about the symptoms Nessler was experiencing and to procure treatment for them. Nessler complained to him of his head and the doctor conducted various tests. The latter testified that Nessler bears a keloid scar and suffers from vestibular imbalance, and to a reasonable medical certainty these ailments are the result of this automobile accident and the imbalance is a symptom of the brain concussion. The doctor also testified that the scar and the imbalance are permanent to a reasonable medical certainty.

Evidence can be found, then, to sustain the verdict in that the negligence of the bus driver was a cause of the collision and that the collision caused the injuries to which Dr. Fox testified. However, we find difficulties in accepting the jury's answers in the special verdict that Nessler was guilty of no causal negligence in this collision. The jury accepted his testimony that his speed was 25 to 28 miles per hour, which was below the speed limit at that place, that he was not negligent in lookout—he saw the bus more than a block away when it ran the stop sign—and his collision was due to no negligence in the management and control of his automobile. But Nessler also testified that when the bus came into Layton avenue, which is 70 feet wide, Nessler was 10 to 15 feet from the east side of Pine street. Nevertheless Nessler tried to turn in that space of time and distance to go to the left to pass behind the bus. How can anyone find that in that situation there is *no* negligence in his management and control?

Further, the only bus speed testified to was five miles per hour entering Layton avenue and reaching eight miles per

hour in crossing it. Nessler says he saw the bus when Nessler was "more than a block away" and the bus did not stop at the sign. Taking 300 feet as the length of a city block and Nessler's maximum speed at 28 miles per hour, Nessler would have seven seconds to reach the point of collision. Although he had seen that the bus was crossing Layton avenue and had seven seconds in time and the length of a city block in which to act to prevent a collision, Nessler managed to run into it. How can a jury absolve him of all causal negligence in both speed and in management and control?

It was conclusively demonstrated that Nessler's testimony was unreliable. To substantiate his damage claim he testified that he had never suffered a head injury before this accident. Yet the court record of a settlement of his claim for a head injury sustained a few years before proved him to have lied on this material issue. Nevertheless the jury chose to take his unsupported testimony in preference to the testimony of three disinterested witnesses about the bus stopping at the sign, and Nessler's testimony concerning his speed in preference to that of the disinterested witness whom he overtook.

For his ills and infirmities alleged to be due to this accident the jury awarded him $13,500, although he himself testified that they did not interfere with his work nor prevent him from playing on a football team, and he can control the headaches of which he complains by pills. The learned trial court cut down the award to $8,250. At least that is a more-reasonable sum but in our opinion the reduction does not cure what we consider to be a verdict which is perverse, the fruit of passion or prejudice, and evidenced by an excessive award of damages. Sec. 251.09, Stats., provides that if on appeal it shall appear to the supreme court from the record that it is probable that justice has for any reason miscarried, that court may reverse the judgment or order or remit the case to the trial court for a new trial. We consider that this

probability is apparent and this is a proper case for the application of this power. A new trial should be had.

Under this disposition of the appeal we need not extend this opinion by consideration of appellants' other assignments of error.

*By the Court.*—Judgment reversed, and cause remanded with instructions to grant appellants a new trial.

* Motion for rehearing denied, without costs, on April 4, 1961.