Kuzel, Appellant, v. State Farm Mutual Automobile Insurance Company, Respondent.

*September 3—October 1, 1963.*

For the appellant there was a brief by *Louis Podell,* attorney, and *Kersten & McKinnon* of counsel, all of Milwaukee, and oral argument by *Charles J. Kersten.*

For the respondent there was a brief by *Kivett & Kasdorf,* attorneys, and *John R. Henderson* of counsel, all of Milwaukee, and oral argument by *Mr. Henderson.*

DIETERICH, J.   The issues involved on this appeal are: (1) Whether the trial court was correct in holding, as a matter of law, that plaintiff-appellant Joseph Kuzel and the driver Ronald Dewey were engaged in a joint enterprise at the time of the collision; (2) whether appellant, not having previously attacked the testimony of the expert witness on motions after verdict, is barred from doing so on appeal, and (3) whether this court should order a new trial in the interest of justice.

The record reveals the following facts: Kuzel's complaint charged Janz with negligence as to speed, management and control, lookout, and driving into the westbound lane into the path of the Dewey automobile. The answer denied all allegations of negligence on the part of Janz, and stated as an affirmative defense that any injuries or damages sustained by Kuzel were caused by his own negligence as to lookout and failure to warn Dewey of oncoming danger. Defendant

later amended the answer alleging that the collision was caused by the negligence of the driver, Ronald C. Dewey, as to speed, management and control, lookout, and driving on the wrong side of the highway into the path of the Janz car. The amended answer also alleged that Dewey and the plaintiff Kuzel were engaged in a joint enterprise and that any negligence on Dewey's part should be imputed to Kuzel.

The collision occurred at approximately 1:50 p. m., on May 25, 1958, near the village of Theresa, Wisconsin. The plaintiff Kuzel was a passenger in a Nash automobile owned and operated by Ronald C. Dewey. They were traveling in a general northerly direction on Wisconsin Highway 175, and as they entered a curve they collided head on with a DeSoto automobile driven by William Janz, which was heading south on the same highway. Janz was killed in the collision, and both Dewey and plaintiff Kuzel were severely injured. Dewey and Kuzel were the only surviving eyewitnesses who testified as to events occurring immediately prior to the collision.

According to the testimony of the investigating traffic officer, the presence of dirt and debris on the highway, as well as skid marks from the Dewey automobile, indicated that the impact occurred in the southbound lane. There were no skid marks from the Janz vehicle. The skid marks from the Dewey car were all in the southbound lane and ran straight and in a right arc to the point of impact. The Janz car remained in the southbound lane, about 21 feet from the point of impact, after the collision. The Dewey car went off the west side of the road and down an incline, coming to rest approximately 26 feet from the west edge of the road.

Plaintiff Kuzel testified that he was reading a newspaper when he heard Dewey scream. He looked up and saw a car coming from the opposite direction and angling toward them. He stated that when the oncoming car was about halfway into their lane, Dewey swerved to the left in an attempt to avoid a collision. However, the other car did not continue in

the northbound lane, but "wheeled back" into its proper lane, where the two cars met.

The testimony of the driver Dewey corroborated that given by Kuzel. He stated that when he saw the front end of the Janz automobile coming over into his lane, he yelled something, swerved to the left and hit the brakes. When the Janz car was about a third of the way into Dewey's lane, it started to swing back into its proper lane, and that was all Dewey remembered. He stated that one side of his car might have hit the left side of the road because he intended to "take the ditch on the left" if he could. Dewey estimated that the Janz car was about 300 feet ahead of them when he first saw it. Kuzel testified that it was his estimate that the Janz car was 15 to 20 yards ahead when he first noticed it, and that he was positive that Dewey was in his proper lane at that time. Kuzel later stated that he could not really judge, and that Janz may have been farther away.

Kuzel and Dewey first met in 1957, at the Union Grove prison farm while each was serving time for a criminal offense. Kuzel was released from prison in October, 1957, and first saw Dewey again in Milwaukee early in 1958. At that time the two men decided to pool their efforts in an attempt to make a living painting and rejuvenating homes. They obtained two or three jobs in Milwaukee, largely through Dewey's efforts, although Kuzel testified that both men had "lined" up jobs. On the night of the accident they were on their way from Milwaukee to Oshkosh to see a former employer of Dewey concerning a prospective job in that city.

Kuzel testified that he had purchased all the equipment used by the two men, and that Dewey supplied the transportation. There was no agreement, but rather a "mutual understanding" that if Dewey paid all the car expense, Kuzel would furnish the materials. The profits were used to increase the capital of the mutual undertaking, although both men drew out money to live on. There was an agreement to the effect

that a certain percentage of the profits from each job would also go to Kuzel as a return on his investment in the tools and equipment. The men were associated under the name "Home Service Company," although they had no corporate franchise. There were no bank accounts under this name, since all transactions were in cash, and no books were kept. The two men discussed job plans and mutually agreed as to what should be done on each job. Although Dewey was required to pay all costs of transportation from job to job, he testified that if he was "a little low," Kuzel would "put in gas and never ask for anything back." The decision to go to Oshkosh was arrived at mutually, although Dewey had made the original suggestion. If the prospect in Oshkosh materialized, Kuzel was to remain there to complete the job, while Dewey was to return to Milwaukee. Kuzel stated that the trip was for their "mutual financial interests," and Dewey also testified that both men would have profited from the job. According to Kuzel's testimony, the car was owned by Dewey, and had been purchased only a few days before the trip to Oshkosh.

The only witness for the defendant other than the investigating police officer, was Professor A. H. Easton, a traffic expert from the University of Wisconsin. Professor Easton's first contact with the case was in November, 1961, some three and one-half years after the accident had occurred. He made one visit to the accident scene on November 25, 1961, and spent approximately one and one-half hours going over the area. The only other data available to Professor Easton were seven photographs taken by the investigating police officer just after the collision and the officer's written report of the accident. Professor Easton's testimony contradicted that of Dewey and Kuzel as to the movement of the automobiles just prior to the collision. He stated that in his opinion the Dewey car had been traveling in a path directly in line with its skid marks for at least 100 feet prior to the

time the brakes were applied. The skid marks were 57 feet in length and were all in Janz's lane. He was also of the opinion that the Janz vehicle had been traveling "more or less parallel to the center line for approximately 50 feet prior to the impact." These opinions were based upon the absence of any "little scuff marks," which Easton stated would be left on the highway by any violent maneuvering of an automobile.

Easton's testimony pertaining to the factual basis for his expert opinion is as follows:

*By Mr. Hartman:*

"*Q.* Is there some way that you can arrive at an opinion in regard to the direction of travel of the Nash prior to the commencement of the skid marks? *A.* Yes. The speed of the vehicle limits the radius of curvature that it can. follow. In other words, without leaving tracks on the highway. In other words, if a vehicle is maneuvered violently on the highway, it will leave a little scuff marks. Nothing is said on the police report about such scuff marks, so we have to assume that in the absence of the statement that there were none. And in the absence of any suggestion in any testimony that there was violent maneuvering or no maneuvering, then that means that the vehicle at least 100 feet, or thereabouts, prior to the skid was traveling in the direction as lining up with the skid.

"*Q.* Do you have an opinion in regard to the DeSoto automobile as to whether or not it continued in the direction of travel it was in at the time of the impact? Whether or not it continued in that general direction for some distance prior to the impact? Do you have such an opinion? *A.* Yes.

"*Q.* And what is the basis of that opinion, Professor? *A.* The same basis. There is certain minimum radius of curvature that the vehicle can travel without leaving scuff marks on the highway, and here again there was. . . .

"*Q.* The basis for that opinion is the speed of the DeSoto? *A.* Yes.

"*Q.* And the absence of any indication of skid marks left by the DeSoto prior to the impact? *A.* Yes. . . ."

*By the Court:*

"Q. Professor, with respect to the fact, as you assume, of a failure of any skid marks or scuff marks which would be related to the centrifugal force of a vehicle going around a curve, you are assuming this fact, are you not, in making your— A. I am assuming that there were none there.

"Q. In your opinion? A. Of course, there are none reported. Let's put it that way.

"Q. And what is the basis of your assumption? What in the evidence of the pictures or the things which are before you is the basis of that particular assumption that there were no scuff marks related to centrifugal force of automobiles going around a curve at a certain speed? A. On Exhibit 16 [photograph], I can observe none. This would be directly in the area prior to the impact, and I don't see any there. This is the only photo that shows anything of that type where it might be seen. . . .

"Q. Professor, you are able to say to a reasonable certainty that based upon the evidence that you see in this one photograph and whatever other evidence you may have, there are no scuff marks there at the scene of the accident immediately following the accident? A. All that I am able to say is that they do not show here. I can't say that there weren't any, no.

"Q. The question was, do you rely on this fact to a reasonable certainty because of your ability to observe these photographs and the other evidence which may have been presented to you? A. The other evidence, of course, is the absence of mention of the scuff marks."

*By Mr. Hartman:*

"Q. On where, Professor? A. On the police report.

"Q. There is no indication there? A. Not that I observe, no."

*By Mr. Kersten:*

"Q. . . . The police report does not say, Professor, that there were no scuff marks, does it? A. No.

"*Q.* It's just a silent testimony? *A.* Just a silent testimony. . . ."

*By the Court:*

"*Q.* Now do you say that the assumed fact that there are no scuff marks on that highway in the area you intend to describe in coming to your opinion is sufficiently established in your mind to a reasonable certainty so that you can hold the conclusion as well as the premise? *A.* Yes. I have this feeling: that if there had been scuff marks there, the officer would have noticed them."

*By Mr. Kersten:*

"I object to that, Your Honor."

*By the Court:*

"The Court understands fully the matter before it."

*By Mr. Hartman:*

"*Q.* Are you also of the opinion, Professor, that if there had been marks there the camera would have noticed them?"

*By Mr. Kersten:*

"I object to this as leading."

*By the Court:*

"The objection is overruled."

*By Mr. Hartman:*

"*Q.* You may answer, Professor. *A.* No, the camera might not show the scuff marks. Sometimes they are very light and, as counsel points out, sometimes the direction of the camera—the picture taken from this direction might not show them, whereas if taken from another might show them. So that we are relying some on the picture and more heavily on the absence in the report."

*By the Court:*

"All right. The objection is overruled. The expert may answer, because the Court feels that the jury understands fully the basis for the answer which is about to be given."

The investigating police officer was called to the stand by the plaintiff at the outset of the case, and testified as to the skid marks left by the Dewey automobile. He was asked the following question during the direct examination:

"*Q.* The only skid marks, therefore, were those that apparently were from the Dewey car, running about 50 feet plus to the south—that is, south from the point of impact? *A.* They were the only marks."

On cross-examination the officer was again asked about marks on the highway by counsel for the defendant:

"*Q.* In other words, these were the only skid marks that were apparent to you on the roadway? *A.* Those were the only ones, yes."

There were no questions as to the presence or absence of any scuff marks on the highway. The officer was also called as a witness for the defendant just before Professor Easton took the stand. Once again he was not asked whether there were, or were not, any scuff marks on the highway.

The special verdict questions submitted to the jury were: Whether Janz was causally negligent in the operation of his vehicle; whether Dewey was causally negligent in the operation of his vehicle; and whether Kuzel was causally negligent as to his own safety. The jury found Janz and Dewey causally negligent in the operation of their vehicles. Kuzel was found negligent as to his own safety just before the collision, but the jury said this negligence was not causal. The negligence was apportioned 10 percent to Janz and 90 percent to Dewey, and Kuzel's total damages were found to be $45,328.65, including medical expenses. There had been a

request for submission of a special verdict question with respect to whether plaintiff Kuzel and his driver, Dewey, were engaged in a joint enterprise at the time of the collision. The trial court refused the request, stating that the court itself would answer such question as a matter of law after the jury returned its verdict. In an addendum to the special verdict, the trial judge held as a matter of law that plaintiff Kuzel and the driver Dewey were, at the time of the collision, engaged in a joint enterprise or partnership, and that Dewey's negligence was imputed to plaintiff Kuzel.

## (1) *Joint Enterprise.*

The fundamental law in this state is that a venture must be for profit in a financial or commercial sense in order for it to constitute a joint enterprise. *Brubaker v. Iowa County* (1921), 174 Wis. 574, 579, 183 N. W. 690; *Krause v. Hall* (1928), 195 Wis. 565, 571, 217 N. W. 290; *Sommerfield v. Flury* (1929), 198 Wis. 163, 166, 223 N. W. 408. See also *Van Gilder v. Gugel* (1936), 220 Wis. 612, 265 N. W. 706; *Schweidler v. Caruso* (1955), 269 Wis. 438, 69 N. W. (2d) 611.

In *Howard v. Riley* (1950), 257 Wis. 594, 599, 44 N. W. (2d) 552, this court said:

" 'When the journey on which the plaintiff and driver of the vehicle are participating is itself a part of a business enterprise in which the parties are mutually interested, the two are engaged in a joint enterprise. It is immaterial that the particular journey is a single transaction and is not a part of the general course of a business in which they are associated as partners or otherwise. It is also immaterial whether the car is owned or hired by the one or the other or by both jointly; the use of the car as a part of a common business enterprise makes each responsible for the manner in which it is operated both as defendant and plaintiff.' "

The doctrine of joint enterprise was discussed again in the recent case of *Edlebeck v. Hooten* (1963), 20 Wis. (2d) 83, 88, 121 N. W. (2d) 240. It was there stated that:

"Four requisites have generally been recognized by the courts to be essential to the existence of a joint adventure: (1) Contribution of money or services but not necessarily in equal proportion by each of the parties, (2) joint proprietorship and mutual control over the subject matter of the venture, (3) an agreement to share profits though not necessarily the losses, and (4) a contract express or implied establishing the relationship."

We further stated in the *Edlebeck Case* that (p. 87):

"Joint adventures are of modern origin, creatures of American courts, not recognized at early common law apart from partnerships, but now considered to be a status created by persons combining their properties or services in the conduct of an enterprise without forming a formal partnership. 30 Am. Jur., Joint Adventures, p. 938, sec. 1. At least as between the parties the association must be with intent to engage in a single business adventure for joint profit for which purpose the participants combine their efforts, property, skill, or knowledge. Each must agree expressly or impliedly to a community of interest as to the purpose of the undertaking and to stand in the relation of agent as well as principal to the other coadventurers with equal right of control of the means employed to carry out the common purpose. 30 Am. Jur., Joint Adventures, p. 939, sec. 2; Annos. 48 A. L. R. 1055, 63 A. L. R. 909, 138 A. L. R. 968."

The undisputed facts in the instant case are that Kuzel and Dewey were engaged in a mutual business enterprise. There was a mutual understanding that Dewey was to contribute the automobile and Kuzel the tools and equipment used in the business. The trip to Oshkosh was made for the purpose of seeking employment through an acquaintance of Dewey's. The decision to go there was mutual, and the trip was in

their mutual financial interests in that both men would have profited from the prospective job. The facts and evidence in the instant action are sufficient to meet the requirements of the rule set forth in the *Edlebeck Case, supra*. Therefore, that part of the judgment of the trial court, which holds that Kuzel and Dewey were engaged in a joint enterprise, and the negligence of Dewey is imputed to Kuzel, is affirmed.

*(2) Whether Kuzel Is Barred From Attacking the Expert Testimony On Appeal.*

The following motions were made by Kuzel: (1) For judgment on the verdict in favor of the plaintiff; (2) for a change in the percentage of negligence, and (3) for a new trial on the grounds that the trial court erred in not finding Janz negligent as a matter of law, or, in the alternative, for a new trial in the interest of justice. Kuzel's primary contention on this appeal is that the testimony of the expert witness must fall because it is not supported by adequate evidence. Neither the record nor the motions after verdict disclose any such assertion by the plaintiff in the court below. This brings the instant case squarely under the rule of *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 518, 80 N. W. (2d) 380, wherein this court stated:

"We deem the correct rule to be that no error of the court should be reviewable as a matter of right on appeal without first moving in the trial court for a new trial bottomed on such error, if the error is of a category that a trial court could correct by granting a new trial."

It should be noted that under the *Wells* rule a party is barred only as a matter of right in such situations; nothing is said concerning this court's discretionary power to consider matters raised for the first time on appeal. This court, in its discretion, may hear and decide questions not presented in the lower court in considering whether or not to grant a

new trial. *General Electric Co. v. Wisconsin E. R. Board* (1958), 3 Wis. (2d) 227, 246, 88 N. W. (2d) 691; *Foellmi v. Smith* (1961), 15 Wis. (2d) 274, 280, 112 N. W. (2d) 712; *Holytz v. Milwaukee* (1962), 17 Wis. (2d) 26, 30, 115 N. W. (2d) 618.

We are of the opinion that the facts of the instant case are such as to warrant exercise of this discretionary power.

The physical facts as testified to by the investigating officer were that the Dewey automobile left 57 feet of skid marks, all in Janz's lane, which ran straight and in a right arc to the point of impact. The skid marks, as well as dirt and debris on the highway, established that the collision occurred in Janz's lane. The Janz automobile left no skid marks.

Dewey and Kuzel gave identical versions of how the accident occurred. According to their testimony, the Janz car was angling into their lane, and Dewey swerved to the left in an attempt to avoid a collision. They both testified that Janz then turned abruptly back into his own lane, where the collision occurred. While the law presumes that a person killed in an accident exercised due care for his own protection, this presumption drops out of the case when evidence sufficient to support a contrary finding comes in. *McCarty v. Weber* (1953), 265 Wis. 70, 60 N. W. (2d) 716; *Atkinson v. Huber* (1955), 268 Wis. 615, 68 N. W. (2d) 447; *Evjen v. Packer City Transit Line* (1960), 9 Wis. (2d) 153, 100 N. W. (2d) 580. The presumption may also be overcome by inferences drawn from other evidence. *Prunty v. Vandenberg* (1950), 257 Wis. 469, 44 N. W. (2d) 246; *Callahan v. Van Galder* (1958), 3 Wis. (2d) 654, 89 N. W. (2d) 210. The testimony of Kuzel and Dewey, the only surviving eyewitnesses, is sufficient to overcome the presumption that Janz exercised due care for his own safety.

The only evidence submitted by the defendant to contradict the testimony of Kuzel and Dewey as to the movement of the two cars just prior to the collision was the opinion of the traffic expert, Professor Easton. He testified that, in his opinion, both automobiles had been traveling in straight lines for some time prior to the collision. This opinion was based solely upon the absence of "little scuff marks" which he stated would be left on the highway by any violent maneuvering of the automobiles. Professor Easton's first contact with the case came some three and one-half years after the accident. The only materials he had to work with were the photographs taken by the investigating officer shortly after the collision, the officer's accident report, and a brief visit to the scene three and one-half years later. Easton testified that he was assuming there were no scuff marks because he could see none on the single photograph showing the highway, and because the written report of the officer did not mention any such marks. He finally conceded that the scuff marks would not necessarily be visible in a photograph.

Aside from Professor Easton's testimony, the record is barren of any mention of either the presence or absence of scuff marks on the highway. The investigating officer was called to the stand by Kuzel at the outset of the case. He was examined by counsel for both parties and no questions were asked concerning any marks on the highway other than the skid marks left by the Dewey automobile. At one point he testified that these were "the only marks," but this was in response to the question: "The only skid marks, therefore were those . . . from the Dewey car?" The officer also testified later in the case, this time as a witness for the defendant insurance carrier, and again no questions were asked pertaining to the presence or absence of any scuff marks on the highway.

The only direct testimony as to the movement of the two cars just prior to the collision was that given by Dewey and

Kuzel. This testimony was in no way contradictory to the physical facts as testified to by the police officer and as shown by the exhibits. A jury has the right to disbelieve the uncontradicted testimony of a witness if it is against reasonable probabilities. *Pagel v. Holewinski* (1960), 11 Wis. (2d) 634, 641, 106 N. W. (2d) 425; *Foellmi v. Smith, supra,* page 283. However, it cannot be said that the testimony of Dewey and Kuzel to the effect that Dewey swerved to the left and applied the brakes to avoid the Janz car, which was angling into his lane, is unreasonable.

### (3) *Whether a New Trial Should Be Ordered in the Interest of Justice.*

Sec. 251.09, Stats., authorizes this court in its discretion to grant a new trial when a record indicates that it is probable that justice has been miscarried. See *Diedrich v. Lukasavitz* (1959), 6 Wis. (2d) 466, 470, 95 N. W. (2d) 267; *Lentz v. Northwestern National Casualty Co.* (1960), 11 Wis. (2d) 462, 466, 105 N. W. (2d) 759; *Nessler v. Nowicki* (1961), 12 Wis. (2d) 421, 429, 107 N. W. (2d) 616. The exercise of this discretionary power is not dependent on whether the aggrieved party protected his rights by objection or motion in the trial court. See *Wells v. Dairyland Mut. Ins. Co., supra,* page 518.

Upon review of the record in the instant case, it appears that the only evidence contradicting the testimony of Dewey and Kuzel was the opinion of the traffic expert, Professor Easton. That opinion is shown to have rested solely on the absence of "little scuff marks" on the highway, and the record is completely barren of any mention of such marks. Easton based his opinion on the fact that the report of the investigating officer did not mention any scuff marks. However, during the course of the trial the defense had two separate occasions to question the police officer as to wheth-

er or not there were any scuff marks on the highway, and no such questions were propounded by counsel for the defense.

Since there was no proof of the absence of scuff marks, the expert's opinion was not founded in fact and must fall. This leaves the jury's finding that Dewey was 90 percent negligent entirely unsupported by any credible evidence. If the plaintiff had attacked the expert's opinion in his motion for a new trial, it would have been error for the trial court not to grant the motion. Since this issue was not raised below, and there being no issue as to the jury's award of damages, we exercise our discretionary power under sec. 251.09 and grant a new trial in the interest of justice, limited to the issues of negligence.

*By the Court.*—Judgment reversed, and cause remanded for a new trial in conformity with this opinion.

CURRIE, J. (*dissenting in part*). I respectfully dissent from that portion of the court's opinion which grants a new trial on the negligence issues in the interest of justice. It is well settled that this court will not exercise this discretion unless it has been convinced that there has been a probable miscarriage of justice, viewing the case as a whole. *Mack Trucks, Inc., v. Sunde* (1963), 19 Wis. (2d) 129, 138, 119 N. W. (2d) 321, and cases cited therein.

If that part of Professor Easton's testimony based upon the absence of scuff marks is eliminated entirely, there still remains enough evidence to sustain the verdict. The 57 feet of skid marks laid down by the Dewey car in the west traffic lane parallel to the center line of the highway in my opinion completely discredits the testimony of Kuzel and Dewey.

Dewey testified that he first turned left to avoid hitting the Janz car and then right when he saw that Janz was returning to his own side of the road. He further testified,

"At the time I started to go into the left lane to avoid the accident, I would say we [Dewey and Janz cars] were about 50 to 60 feet apart."

Kuzel testified as follows: He was reading a paper at the time and looked up when he heard Dewey scream and saw the other car coming into the east traffic lane. "Almost immediately Mr. Dewey wheeled the car to the left to avoid a collision with this oncoming car. He tried to get out of his way to avoid this collision. At that time, the other driver must have had the same idea and wheeled back into his lane and we met in his lane, in the left-hand lane. That is, left hand for us. When I looked up when Dewey screamed and jerked the car into the opposite lane, I would say the other car was about 15 to 20 yards ahead of us."

The 57 feet of skid marks in the west traffic lane paralleling the center line are wholly inconsistent with a sudden turning of the Dewey car first to the left and then to the right. They are much more consistent with the premise that in rounding the curve the Dewey car had gotten over the center line into the west traffic lane.

In view of the foregoing, I would apply the rule of *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 518, 80 N. W. (2d) 380, quoted in the majority opinion; refuse to exercise our discretionary power to consider an alleged error not brought to the attention of the trial court by the motions after verdict; and affirm the entire judgment.