BACH, Respondent, v. LIBERTY MUTUAL FIRE INSURANCE COMPANY and others, Appellants.

*September 6—October 3, 1967.*

74

For the appellants Liberty Mutual Fire Insurance Company and Dale A. Hamlin there were briefs by *Welsh, Trowbridge, Bills, Planert & Gould* of Green Bay, and oral argument by *Lloyd J. Planert.*

For the appellant Glen C. Rickert there was a brief by *Hoerl, Day & Kamps* of Marshfield, and oral argument by *Donald R. Hoerl.*

For the respondent there was a brief and oral argument by *John S. Crawford* of Madison.

WILKIE, J.  Five issues are presented on this appeal:

1. Is there credible evidence to support the jury's finding as to causal negligence of Hamlin?

2. Were Bach and Rickert engaged in a joint enterprise as a matter of law?

3. Were the damages awarded to Bach for personal injuries excessive?

4. Was the award for loss of earnings up to the time of trial excessive?

5. Should a new trial be granted in the interest of justice?

## Causal Negligence of Hamlin.

The first issue presented is whether there is credible evidence to support the jury's finding that Hamlin was causally negligent. The crucial question is whether either or both of the defendants were across the center line of the highway at the time of the impact.

There is no evidence of any physical marks on the road and the physical damage to the cars was not helpful in deciding the question. The position of the cars after the accident, as is usually the case,[1] had no probative value. The jury had only the testimony given from the witness stand on which to base its findings.

There were no independent witnesses to the accident. Only three people—Bach, Rickert and Hamlin—could recount the events that preceded the collision. A fourth person present at the time of the accident, one Elizabeth

---

[1] *New Amsterdam Casualty Co. v. Farmers Mut. Automobile Ins. Co.* (1959), 5 Wis. 2d 646, 94 N. W. 2d 175.

Ann Stoop (now Mrs. Elizabeth Shaver), a passenger in Hamlin's vehicle, was asleep before and at the time of the accident. Hamlin testified that Rickert's car lurched into his lane at the time of impact, whereas Bach and Rickert testified that the Rickert car was on the south shoulder when Hamlin's vehicle veered into their lane and the collision ensued. Hamlin's testimony was clear, definite and positive as to the fact that he was in his own lane at impact, whereas Rickert admitted during cross-examination that he was "not positive" and only "quite sure" that he was on his own side of the road. But the jury was not required to accept the Hamlin version. Rickert did state that the Hamlin vehicle did invade his lane. Both Rickert and Bach testified that Rickert's vehicle was partly on the shoulder prior to impact. Rickert stated that he was starting to turn back onto the concrete portion of the highway immediately prior to impact.

During the trial Rickert denied unequivocally that his car slid or slued at any time prior to the accident. To impeach Rickert, Hamlin's attorney presented a signed statement given just after the accident by Rickert to Ronald Helland, the Price county traffic officer, in which statement Rickert said his car slued. The weight to be given to the statement as against Rickert's testimony at the trial was for the jury to decide.

The jury apparently came to the conclusion that immediately prior to the accident both automobiles overlapped the center of the highway, invading the wrong lane of traffic and thus both were negligent. Its determinations that Hamlin was causally negligent and to the extent of 40 percent are supported by credible evidence and must be affirmed.[2]

---

[2] *Dewing v. Cooper* (1967), 33 Wis. 2d 260, 265, 147 N. W. 2d 261; *Burlison v. Janssen* (1966), 30 Wis. 2d 495, 141 N. W. 2d 274.

*Joint Enterprise.*

The defendants, Hamlin and his insurer, seek to invoke the doctrine of joint enterprise so as to impute Rickert's negligence to Bach and thus bar Bach's recovery against Hamlin. The contention is that Rickert and Bach were engaged in a joint enterprise at the time of the accident, that Rickert was Bach's agent and that Rickert's negligence is imputed to Bach.

The term "joint enterprise" has evolved in the field of automobile law and is used interchangeably with the term "joint adventure." We have stated:

"The terms are often used to describe a special business arrangement of less dignity but partaking of some essentials of a partnership and governed by the laws applicable thereto and sometimes to describe or characterize the relationship of a driver of an automobile and his passengers to determine the imputation of negligence." [3]

The relationship must be voluntarily assumed with its essence being that it binds the parties and obligates them to perform. A mere agreement to accompany one another upon an excursion without an intent to enter into mutually binding obligations is not sufficient to create the relationship of joint enterprise.

The purpose of the enterprise must be joint or common to both. There must be common business, pecuniary or other financial objective in the journey. In *Kuzel v. State Farm Mut. Automobile Ins. Co.*[4] we stated:

"The fundamental law in this state is that a venture must be for profit in a financial or commercial sense in order for it to constitute a joint enterprise."

The justification for this position is that such a financial venture involves a closer analogy to the law of partner-

---

[3] *Edlebeck v. Hooten* (1963), 20 Wis. 2d 83, 87, 121 N. W. 2d 240.
[4] (1963), 20 Wis. 2d 558, 568, 123 N. W. 2d 470.

ships, and affords more reason for regarding the risk as properly to be charged against all those engaged in it. Thus, the similarity between partnerships and joint enterprises was recognized in this state in *Barry v. Kern*,[5] where the court said:

"Essentially there is little difference between a partnership and a joint adventure, the latter, as a rule, being more limited and confined in its scope principally to a single transaction."[6]

The specific requisites for a joint enterprise have been stated by this court in *Edlebeck*:[7]

". . . (1) Contribution of money or services but not necessarily in equal proportion by each of the parties, (2) joint proprietorship and mutual control over the subject matter of the venture, (3) an agreement to share profits though not necessarily the losses, and (4) a contract express or implied establishing the relationship."

The trial court found as a matter of law that there was no joint-enterprise relationship between Bach and Rickert and appellants Hamlin and his insurer contend that there was a joint enterprise as a matter of law, or at least that there was a jury question as to whether such a relationship existed.

Applying the facts of the instant case in the light of the four requirements of joint enterprise as stated in *Edlebeck*, we believe that the trial court was entirely correct in ruling as a matter of law that there was no

---

[5] (1924), 184 Wis. 266, 199 N. W. 77.

[6] *Id.* at page 268. See *Employers Mut. Liability Ins. Co. v. Parker* (1954), 266 Wis. 179, 181, 63 N. W. 2d 101; *Lewis v. Leiterman* (1958), 4 Wis. 2d 592, 91 N. W. 2d 89.

[7] *Supra*, footnote 3, at page 88. Followed in *Kuzel v. State Farm Mut. Automobile Ins. Co.*, *supra*, footnote 4. The abbreviated definition of joint enterprise in the recent case of *Bailey v. Hagen* (1964), 25 Wis. 2d 386, 393, 130 N. W. 2d 773, emphasized elements (2), (3) and (4). This was dicta and did not alter the four requisites of a joint enterprise as stated in *Edlebeck*.

joint-enterprise relationship between Bach and Rickert. This follows from the fact that one of the elements of joint enterprise, to wit, an agreement to share profits, was missing. Bach and Rickert either quit or were laid off by a building contractor for whom they worked as carpenters. Both men were also farmers. They lived only about one mile away from each other. Following the layoff the men were able to get some carpenter work through connections with Dorchester Pole Yards of Medford, Wisconsin. In all, the men worked together on six jobs including the Zorn Cheese Factory job from which they were returning on the day of the accident. On these jobs both men furnished equipment for their mutual use. Bach furnished power saws and drills, while Rickert furnished hand tools, a ladder, pike poles, a saber saw, and other equipment. Each was to use his own car and drive from time to time. Both paid each other for car expense.

On all the jobs Bach and Rickert were paid separately for their labor. Materials were bought directly from the supplier. On four jobs they were each paid by the hour; on two others, they were each paid on a square-foot basis. Both methods involved the payment of wages, not profits in the conventional sense. Webster defines profit as being financial or monetary gain obtained from the use of capital in a transaction and the difference between income and costs.[8] The Uniform Partnership Act [9] defines a partnership as an association of two or more persons to carry on as co-owners a business for profit.[10] In view of the close analogy between partnerships and joint enterprises, it logically follows that the definition of profit for joint-enterprise purposes should be the same as for partnership purposes.

[8] Webster's New World Dictionary of the American Language (College ed., 1964), p. 1163.

[9] Ch. 123, Stats.

[10] Sec. 123.03 (1), Stats.

In *Montello Granite Co. v. Industrial Comm.*[11] the court held that the profits mentioned in sec. 123.03 (1), Stats., must be real profits and not wages or compensation.

Although the two men were always paid in equal amounts, this was not because they were sharing profits, but because they worked the same number of hours or did the same amount of work. While on cross-examination Rickert did say that he and Bach "share the profits" and "were partners," these statements are of no relevancy because what the parties call themselves is a legal conclusion and not a fact.

We conclude that as a matter of law the absence of a sharing of profit in this undertaking is sufficient reason, standing alone, for holding as a matter of law that Bach and Rickert were not engaged in a joint enterprise at the time of the accident. Because of the absence of this one element of joint enterprise, it is not necessary for us to examine the relationship here between Bach and Rickert in the light of the other three requisites of a joint enterprise.

### Excessive Damages for Personal Injury.

Appellants contend that the jury award of $18,000 for personal injuries to the plaintiff is excessive. This part of the award covers damages for personal injuries, related pain and suffering and loss of earnings from the trial into the future.

The standard of this court's review is that where there is any credible evidence which under any reasonable view supports the jury finding, especially when the verdict has the approval of the trial court, it should not be disturbed.[12]

---

[11] (1938), 227 Wis. 170, 278 N. W. 391.

[12] *Metcalf v. Consolidated Badger Co-operative* (1965), 28 Wis. 2d 552, 561, 137 N. W. 2d 457; *Springen v. Ager Plumbing & Heating, Inc.* (1963), 19 Wis. 2d 487, 489, 120 N. W. 2d 692;

We are handicapped on this appeal in that there is no analysis of the evidence by the trial court. Because the trial judge has the advantage of personal observation of the witnesses, particularly the plaintiff, his decisions on the excessiveness of a verdict have great weight on review. Because of the heavy reliance placed by this court on the trial court's view of the damages, this court has declared that when a verdict is found to be excessive by the trial court, the trial court "should state its reasons for its determination." [13] Where the trial court determines that the jury verdict is not excessive, we have recommended that the trial court state its reasons for so ruling. [14]

In the instant case the trial court did not file a detailed memorandum but stated that the award, although at the "upper limits of damages" was "not out of reason." Because of the absence of an analysis by the trial court, this court on appeal must "review the entire record as a matter of first impression and ascertain whether, in its judgment, the verdict is excessive." [15]

As a result of the accident Bach was thrown forward, his face smashed into the windshield causing the glass to break. Bach had four severe lacerations across the face and was bleeding profusely. When Bach was brought to the hospital a physical examination disclosed that his skin was clammy and that his blood pressure was low. He had a large cut under the nose and across the cheek with multiple small bone fragments visible in the cuts. There was a long vertical laceration on the

*Erdmann v. Milwaukee Automobile Mut. Ins. Co.* (1963), 20 Wis. 2d 439, 122 N. W. 2d 430.

[13] *Moritz v. Allied American Mut. Fire Ins. Co.* (1965), 27 Wis. 2d 13, 24, 133 N. W. 2d 235.

[14] *Ballard v. Lumbermens Mut. Casualty Co.* (1967), 33 Wis. 2d 601, 607, 148 N. W. 2d 65 (not decided at the time of trial).

[15] *Moritz v. Allied American Mut. Fire Ins. Co., supra,* footnote 13, at page 24.

left side of his forehead and a laceration of the right upper eyelid and a vertical laceration on the right external ear. Bach was operated upon and remained hospitalized for four days. Dr. Ralph Bennett, a general practitioner from Ladysmith, performed the operation and testified that in addition to the lacerations and broken bones in Bach's face, X rays had disclosed that the septum of the nose was displaced out of the middle of the nose and off to one side. Dr. Bennett said that this displaced septum would have ramifications for Bach's health. For example, if Bach were to catch a cold he would also suffer a sinus infection because the displacement of the septum would interfere with the free drainage from the sinuses. Dr. Bennett testified that because there were fractures around the face it was probably more painful than the average fracture. Dr. Bennett also said that the injuries were permanent, that Bach would continue to have pain, that he had suffered a 15 percent permanent disability of the whole man, and that he would have pain in the future whenever his face was exposed to cold or damp weather. On cross-examination Dr. Bennett admitted that a deviated septum is not a rare affliction and that it can be corrected surgically by a minor operation. Dr. Bennett had not treated or seen Bach from the time he was released from the hospital (four days after the accident) until the date of the trial.

The major residuals from the accident were several scars on Bach's face.

Dr. James Kramer, a specialist in internal medicine from Wausau, was the only other medical witness called during the trial. Dr. Kramer had examined Bach at the request of the defendants several months before the trial. Dr. Kramer testified that the scars were permanent, that there was a numbness and a loss of sensation over the cheek bone due to the injury, that there was a weakness in the muscles on the right side of the mouth and that

Bach did have a deviated nasal septum. Dr. Kramer also said that the deviated septum was not irreparable and that it was "very likely" that surgery could correct it. Dr. Kramer also stated that he did not feel that there was any relationship between the accident and some of Bach's maladies.

Appellants contend that Dr. Bennett should not have been allowed to express an opinion as to Bach's permanent disability. They rely on *Rivera v. Wollin*,[16] wherein this court held that a doctor who had last examined the plaintiff eleven months before the trial could not give an opinion as to the future pain and suffering because his contacts with the plaintiff were too remote to be a foundation for the award. *Rivera* is distinguishable because it is grounded on the question of whether or not the rule of *Diemel v. Weirich*[17] was met. In *Diemel* the court quoted from 20 Am. Jur., *Evidence,* p. 649, sec. 778, as follows:

" '. . . where the injury is subjective in character and of such nature that a layman cannot with reasonable certainty know whether or not there will be future pain and suffering, the courts generally require the introduction of competent expert opinion testimony bearing upon the permanency of such injury or the likelihood that the injured person will endure future pain and suffering before allowing recovery therefor.' "[18]

The *Diemel* rule is only applicable when the injuries are "subjective in character." In this case, Bach's injuries (*i.e.,* the deviated septum and the scars, etc.) are objective, hence *Diemel* and *Rivera* are not applicable.

We conclude that that part of the jury award in the amount of $18,000, though high, is "not out of reason" and is within the range of reasonably debatable amounts. It is not excessive.

[16] (1966), 30 Wis. 2d 305, 140 N. W. 2d 748.

[17] (1953), 264 Wis. 265, 58 N. W. 2d 651.

[18] *Id.* at page 268.

*Loss of Earnings to Date of Trial.*

The accident occurred December 8, 1962, the trial was commenced April 25th and concluded April 27, 1966. The jury found that during this period Bach suffered a $3,500 loss of earnings. Defendants also urge that this part of the award is excessive. Bach did not work from the date of the accident until May 5, 1963. Bach claimed that his ability to do carpentry work and trapping was curtailed after the accident due to his inability to function properly in cold weather. In addition to not working for five months following the accident, Bach also testified that he lost three pole building jobs in 1966 due to his inability to work in cold weather. It is undisputed that when working Bach earned approximately $2.50 an hour. It was shown that Bach earned $2,519.74 in 1961, the year before the accident, and $4,647.48 in 1963, the year following the accident. Nevertheless, the fact that a man earns more after an accident than he did before is not conclusive on the question of whether he suffered a loss of earnings after the accident. There was credible evidence that Bach had lost working time as a result of the accident. The jury was justified in making this award for loss of earnings over the three-and-one-half-year period between the date of the accident and the date of the trial. The jury verdict in this respect must be affirmed.

*New Trial in the Interest of Justice.*

The supreme court only grants a new trial in the interest of justice under sec. 251.09, Stats., when it appears from the record that justice has miscarried. In our opinion justice has not miscarried and, accordingly, this court will not invoke its discretionary powers under sec. 251.09 to grant a new trial.

*By the Court.*—Judgment affirmed.