GERVAIS, Plaintiff and Respondent, v. KOSTIN and others, Defendants and Appellants: OLSEN, Third-Party Defendant and Respondent. [Case No. 181.] *

OLSEN, Respondent, v. KOSTIN and others, Appellants. [Case No. 182.] *

*Nos. 181, 182. Argued September 10, 1970.—Decided October 6, 1970.* (Also reported in 179 N. W. 2d 828.)

---

* Motion for rehearing denied, with costs, on December 1, 1970.

For the appellants there was a brief by *Heide, Sheldon, Hartley, Thom & Wilk* and *William A. Sheldon,* all of Kenosha, and oral argument by *William A. Sheldon.*

For the respondent George G. Gervais there was a brief by *Phillips, Richards & Mayew* of Kenosha, and oral argument by *Charles J. Richards.*

HANLEY, J. The issues presented on this appeal are:

(1) Was Gervais, not Olsen, the driver at the time of the accident;

(2) Did the trial court commit prejudicial error in restricting the use of the deposition of the respondent Olsen;

(3) Was the negligence of the respondent Olsen, as a matter of law, greater than the negligence of the appellant Kostin;

(4) Was the negligence of the respondent Olsen imputed as a matter of law to the respondent Gervais; and

(5) Were the damages awarded to Gervais excessive?

*Operator of motorcycle.*

Both Gervais and Olsen testified that at the time of the collision Olsen was the operator and Gervais was the passenger. Appellants' contention to the contrary is based solely on two statements—one from Olsen and one from Gervais taken by Dr. Peterson at the hospital shortly after the accident. According to Dr. Peterson he received the following history from Gervais:

"About 3 PM June 22, 1966, this patient was the driver of an automobile with Wayne Olsen as a passenger apparently heading south on Highway 31 about to turn left on 52nd street going toward Kenosha when there was some kind of a collision with an automobile headed North on Highway 31. Details are not clear as to exactly what happened. The patient came in with very marked trauma to the right lower extremity which had already been splinted by the Police. They informed me that the leg was almost torn off.

". . .

"He was married at the age of 17 and had 3 children."

This history contained three significant contradictions from the factual situation: Gervais was married at age nineteen, not seventeen; he has five children, not three; and he was injured on a motorcycle, not in an automobile.

At the trial, Dr. Peterson testified that these errors "would suggest that the patient had had a sufficiently substantial head injury so that it would throw in doubt what he had told me about the whole situation."

In referring to this statement by Dr. Peterson, the appellants contend there is nothing to support the "head injury" conclusion. They also contend the trial court erred when it assumed Gervais had a skull fracture. The record contains abundant evidence of a head injury.

Witness Budzenski who saw Gervais fly into the air stated:

"When he first landed face first, it's just like somebody threw a tomato on the ground. . . ."

There was also medical testimony by Dr. Sattler who testified:

". . . Again the record shows that X rays of the skull revealed a linear fracture occiput. . . ."

Thus the testimony of three witnesses—Budzenski and Drs. Peterson and Sattler—all point to a head injury afflicting Gervais when a history was taken by Dr. Peterson at the hospital.

The fact that Gervais was a passenger and Olsen the driver is further substantiated by the testimony of Budzenski when he identified Gervais as the person who flew off the "rear" seat and came down on his head.

The appellants introduced a second prior inconsistent statement, this one by Olsen, wherein he is alleged to have told Dr. Sattler that he (Olsen) was a passenger. Olsen denied making this statement at the time of trial. He also denied making it prior to trial when he was adversely examined.

Appellants argue that this statement was entitled to a great deal more weight than the jury apparently gave to it and that it should have been received as substantive evidence of the truth of the statements contained therein, as opposed to being received merely as a prior inconsistent statement available for impeachment purposes only. In support of this argument appellants cite *Gelhaar v. State* (1969), 41 Wis. 2d 230, 241, 163 N. W. 2d 609.

We think the Olsen statement was not entitled to substantive weight because it fails to satisfy any of the preconditions set forth in *Gelhaar, supra*. In the instant case the statement was not written nor signed by Olsen; it was not in a judicial or official hearing; and the declarant did not acknowledge the making of the statement in the present proceeding. In fact, the record shows that Olsen denied ever stating to Dr. Peterson that he was the driver.

Moreover, even if the statement were of substantive merit, this court has held that:

". . . Where the conflict or contradiction arises by reason of an earlier statement given by the witness, it is for the jury to determine the question of the weight and credence to be given the witness-stand testimony and prior extrajudicial statement. . . ." *Ianni v. Grain Dealers Mut Ins. Co.* (1969), 42 Wis. 2d 354, 360, 166 N. W. 2d 148.

The question as to who was the driver of the motorcycle is clearly a question of fact for the jury. There was ample credible evidence for the jury to conclude that Olsen was the driver.

### *Restriction of the use of Olsen deposition.*

Appellants' second contention is that the trial court erroneously restricted the use of an adverse examination of Olsen taken in Rhode Island.

The record is not clear as to whether or not service had been made on Olsen prior to January 30, 1969, the date of the taking of the adverse examination.

However, assuming there was proper service, we are satisfied that any error was eliminated when the appellants had the opportunity to examine Olsen at length at the trial. This issue involved the question of who was driving the motorcycle.

We have already concluded that there was ample credible evidence to support the jury's conclusion on that issue.

### Comparative negligence.

The appellants contend that as a matter of law the negligence of the driver of the left-turning vehicle exceeded that of Kostin. Here the jury was entitled to believe the negligence of Kostin was the principal cause of this accident. By his own admission, he knowingly approached a congested intersection without reduction of speed as required by sec. 346.57 (3), Stats. This act was coupled with his total failure to see the motorcycle before the impact. Furthermore, as he approached the intersection, he observed two northbound cars ahead of him, stopped in the inside lane, waiting to turn. Without reacting to the obvious peril, Kostin swung his car into the outside lane and continued to the point of impact.

Olsen testified that he stopped in the inside, southbound lane, looking ahead before he began his turning. He saw the stopped northbound cars. The driver of the first car in the northbound lane who was stopped waiting to make a left turn signaled Olsen to make his turn. Only when he was signaled to turn did he begin to do so. This turn was made apparently at about the time the traffic light was turning yellow. At this very instant the Kostin car undoubtedly was moving into the outside, northbound lane.

In addition to these facts, it should be noted that Kostin testified that at 2,000 feet from the intersection he was going 40 miles per hour, that at 1,500 feet, he reduced his speed to 25 miles per hour; and that from 1,500 feet to the point of impact, his speed never varied from 25 miles per hour. Kostin's car left skid marks of 90 feet.

Also, in regard to the state of the light at the time of the accident, appellants argue that "It is uncontradicted

that the north-south lights were green at all times material to this accident," and, further, that there "is a total absence of proof that during any portion of this accident the lights for north-south traffic had turned yellow."

These arguments are not supported by the record.

The jury had the right to believe the testimony of Budzenski who witnessed the accident from a good vantage point. He testified that he traveled this road to work every day and that he did not complete his intended right turn because the lights were on the verge of changing as Olsen started to turn.

Kostin admitted that he did not look at the light until he was 500 feet from the intersection and that he did not see it change from red to green but that it was green at the time of his first observation.

The jury also had a right to believe that the yellow caution light came on for north-south traffic at the moment that the motorcycle pulled out to make its left turn.

In *Neider v. Spoehr* (1969), 41 Wis. 2d 610, 165 N. W. 2d 171, there is a somewhat similar situation to the present case. In that case the two cars involved in the impact were on a through highway and the defendant's car was about to make a left-hand turn onto an intersecting road and was struck by an oncoming car from the other direction. In the *Neider Case* the plaintiff was in the same position as the defendant in this case, where Spoehr was in the same position as the plaintiff Olsen. The jury found in answering the comparison question a 75–25 percent apportionment against the oncoming driver and in favor of the left-turn driver. The apportionment was upheld.

We reiterate the rule stated in *Neider, supra,* at page 621:

"The rule rigidly adhered to by this court is that if there is credible evidence, which under any reasonable view, supports the jury's finding as to comparative negligence the finding will not be set aside."

We think the percentages of negligence as found by the jury are not so disproportionate as to require this court to substitute its judgment for that of the jury and the trial court.

### Imputing negligence as a matter of law.

Appellants contend that if Olsen was the driver, then his negligence should be imputed to Gervais.

It was conceded that Gervais owned the motorcycle. Where the owner is riding as a passenger, there arises a rebuttable presumption that the driver of such vehicle is acting as an agent for the owner-passenger. Under such circumstances the negligence is imputed to the owner-passenger. *Ruby v. Ohio Casualty Ins. Co.* (1967), 37 Wis. 2d 352, 155 N. W. 2d 121.

The appellants' claim of imputed negligence cannot be sustained, since agency and the imputed negligence resulting therefrom is an affirmative defense and must be pleaded or deemed waived.

Apparently the appellants tried this case on the theory that Olsen was a passenger and Gervais the operator and therefore did not plead agency as an affirmative defense. However, we find no basis for imputing the negligence of Olsen to Gervais. The facts clearly establish that Olsen drove the motorcycle solely for the pleasure of trying out Gervais' newly purchased motorcycle. The purpose of the trip was purely social. Gervais derived no benefit and served no purpose of his own by letting Olsen drive. These facts clearly dispel any presumption of agency.

### Excessiveness of damages.

Appellants' final contention is that the damages awarded Gervais were excessive. The appellants confine their attack to the portion awarding $100,000 for personal injuries.

The initial determination of the adequacy or excessiveness of an award is to be made by the trial court on motion after verdict. The trial court must then view the evidence in the light most favorable to the jury verdict and determine if there is any credible evidence. Then the question on review is simply whether the trial court abused its discretion in concluding that the credible evidence supported the verdict and not what the supreme court would have awarded had the question of damages been before it initially. *Page v. American Family Mut. Ins. Co.* (1969), 42 Wis. 2d 671, 168 N. W. 2d 65.

Under the above circumstances great weight is given to the trial court's approval of reasonableness of the damage award. On the other hand, where the trial court on motions after verdict merely states that the award is reasonable and files no supporting memorandum, then the supreme court can give no additional weight to such approval but must review the entire record as a matter of first impression. *Bach v. Liberty Mut. Fire Ins. Co.* (1967), 36 Wis. 2d 72, 152 N. W. 2d 911.

The trial court in its memorandum decision reviewed the damages extensively and stated in detail the reasons for sustaining the jury's award.

Personal injuries covered the loss of or impairment of future earning capacity, physical disability from a social and recreational point of view as distinguished from the economic or earning point of view (both past and future), and pain and suffering, together with mental worry both past and future.

At the time of trial Gervais had a life expectancy of 35.33 years. He worked at American Motors full time and, in addition, had a second job as a beef boner, earning $2.25 per hour and worked a thirty-hour week. He can no longer work as a beef boner because of his disability.

As a result of the collision, Gervais suffered a concussion, and Dr. Sattler was of the opinion that he had a small linear skull fracture. In addition, he sustained

a slight shoulder separation. On his admission to the hospital, he suffered a paralysis of the bowels which was corrected several days later. He sustained a comminuted compound fracture of the tibia and fibula with severe soft tissue damage. He also sustained a comminuted fracture of the femur of the right leg. The right knee cap was smashed; the right ankle was fractured and the bone fragmented.

Plaintiff Gervais spent, in the first instance, ninety-seven days in the hospital, eighty-five of which were in total confinement in a cast. After his release from the hospital, on October 1, 1966, he remained at home for five weeks confined to bed or couch. He was required to return to the hospital for another forty-seven days. It was not until August 7, 1967, nearly fourteen months after the accident that Gervais was permitted to return to work. The evidence reveals that when he returned to work he was unable to handle the job because of his injuries and he was laid off for a month until an easier job could be found for him.

On February 3, 1968, plaintiff returned to the hospital for surgery involving a cutting of the heel cord so as to place the foot into a better position; to remove scar tissue and partially open the ankle joint; and to remove the large toenail on the right foot and amputate a part of the toe so that in walking plaintiff would be better able to avoid constant irritation to the toe.

Dr. Sattler, the orthopedic expert, also stated that in addition to the 50 percent permanent partial disability of the leg, there would be restricted knee motion which would interfere with kneeling or squatting; further that the plaintiff will suffer from a stiff ankle and foot for the rest of his life; that he will be required to wear a support stocking or bandage because of extensive scarring on the right leg; and that from time to time in the future the skin will break down, and he will lose work by reason of such breakdown.

We conclude that there is ample credible evidence to support the jury's verdict, and it was not an abuse of discretion for the trial court to deny defendants' motions after verdict.

*By the Court.*—Judgments affirmed.