PEIL, by Guardian *ad litem,* Plaintiff and Respondent, v. KOHNKE, Defendant: BADGER STATE MUTUAL CASUALTY COMPANY, Defendant and Appellant: GENERAL CASUALTY COMPANY OF WISCONSIN, Defendant and Respondent. [Case No. 201.] *

MELCHER and another, Plaintiffs and Respondents, v. GENERAL CASUALTY COMPANY OF WISCONSIN and another, Defendants and Appellants: KOHNKE, Defendant. [Case No. 202.] *

PEIL, Plaintiff and Respondent, v. GENERAL CASUALTY COMPANY OF WISCONSIN, Defendant and Respondent: KOHNKE, Third-party Defendant: BADGER STATE MUTUAL CASUALTY COMPANY, Third-party Defendant and Appellant. [Case No. 203.] *

KOHNKE, Plaintiff and Respondent, v. GENERAL CASUALTY COMPANY OF WISCONSIN, Defendant and Appellant: BADGER STATE MUTUAL CASUALTY COMPANY, Third-party Defendant and Respondent, and Cross-appellant. [Case No. 204.] *

*Nos. 201–204. Argued January 4, 1971.—Decided March 2, 1971.*
(Also reported in 184 N. W. 2d 433.)

* Motions for rehearing denied, with costs, on May 4, 1971.

For the defendant-appellant General Casualty Company there were briefs by *deVries, Vlasak & Schallert* of Milwaukee, and oral argument by *Stephen C. deVries*.

For the plaintiff-respondent Suzanne Felde Peil there was a brief by *Habush, Gillick, Habush, Davis & Murphy* of Milwaukee, and oral argument by *James J. Murphy*.

For the defendant-respondent Frank E. Kohnke there was a brief on cross appeal of Badger State Mutual Casualty Company by *Peregrine, Marcuvitz, Cameron, Braun & Peltin,* attorneys, and *Edward R. Cameron* of counsel, all of Milwaukee, and oral argument by *Hugh R. Braun*.

For the defendant-respondent and cross appellant Badger State Mutual Casualty Company there was a brief by *Wickham, Borgelt, Skogstad & Powell,* attorneys, and *Kurt H. Frauen* of counsel, all of Milwaukee, and oral argument by *Mr. Frauen*.

For the plaintiffs-respondents Larry W. Melcher and Kathleen Star Darga there was a brief and oral argument by *Alvin L. Zelonky* of Milwaukee.

For the defendant-respondent General Casualty Company of Wisconsin on the issue of coverage there was a brief by *deVries, Vlasak & Schallert,* and oral argument by *Michael B. Rick,* all of Milwaukee.

WILKIE, J. The issues involved on these appeals from the judgments entered following this fifty-four-day jury trial naturally divide themselves, as does the opinion, into three subjects: liability, damages and coverage. We will consider them in that order.

## I. Liability

The issues presented on the liability phase of this collection of cases are as follows:

1. Did the expert witness, Professor James Van Vleet, presented by Badger State give an opinion based upon unestablished assumptions?

2. Was his opinion on redirect examination that a "scuff mark" was "possibly" made by the (Kohnke) Cadillac's right rear tire properly received and not prejudicial?

3. Was it error to exclude the prior inconsistent statement made by Gerald Peil to the investigation officer?

1. *Expert opinion.*

General Casualty urges that Professor Van Vleet's "expert opinion" was based upon unestablished assumptions. If this is true, a finding based on such opinion cannot be sustained.[1] A search of the record, however, does not substantiate appellant's contention on this point.

---

[1] *Hicks v. New York Fire Ins. Co.* (1954), 266 Wis. 186, 189, 63 N. W. 2d 59.

Certain exhibits presented at trial, notably photographs of the accident scene immediately after the collision, show the Cadillac in its final resting position. These photographs show a long skid mark leading up to the Cadillac's left rear wheel. The photographs, however, do not clearly disclose whether the skid mark extends beyond the rear wheel and under the rear of the car, *i.e.*, whether the skid mark was in fact made by the left rear wheel or the right rear wheel. It is clear from the evidence, however, that if the skid mark was in fact made by the left rear wheel, the Cadillac was in its proper lane at the time of the collision; while if the skid mark was made by the right rear wheel of the Cadillac, the collision then must have occurred in the Pontiac's lane.

Appellant contends that Professor Van Vleet based his opinion that the collision occurred in the Cadillac's lane on the assumption that the skid mark was in fact caused by the left rear wheel; and further, that he assumed this because of his opinion that the collision occurred in the Cadillac's lane. In short, appellant urges that Professor Van Vleet's opinion was entirely speculative since based on mere assumption of facts not in evidence.

Professor Van Vleet's opinion was based on a hypothetical question phrased by counsel for Badger State. The hypothetical, as posed, was based in part on testimonial evidence, in part on photographic exhibits, especially those showing the skid marks, and on his expertise and Newton's laws. The original hypothetical contained the following phrase:

"As shown on Exhibits 1, 1–A, 22 and 22–A *a tire or skid mark made by the left rear tire of the Cadillac automobile* extends from the south to the north leading into the left rear tire of the Cadillac as shown . . . ." (Emphasis added.)

This hypothetical was objected to, in part because it assumed the skid mark was made by the left rear tire

of the Cadillac. This objection was sustained. Thereafter, the hypothetical was rephrased with respect to that objection as follows:

"A tire or skid mark from the south to the north *leading to the left rear wheel of the Cadillac* as shown . . . ." (Emphasis added.)

Counsel then asked:

"Professor, based upon that hypothetical question and assuming all of those facts set forth in the hypothetical question, *including all of the facts revealed by the pictures,* which you have studied, do you have an opinion to a reasonable degree of scientific probability as to whether the impact between the Cadillac and the Pontiac occurred in the east lane or in the west lane?" (Emphasis added.)

The witness replied he did and stated:

"It is my opinion that the contact, the collision, occurred in the northbound or east lane [Cadillac's]. *That is brought out by the location of the debris in that lane.*" (Emphasis added.)

Appellant here contends that this opinion should have been stricken, as should all of his testimony have been, because the testimony was merely a series of opinions based upon other opinions.

a. *Collision lane.* The record clearly establishes that Professor Van Vleet's opinion with respect to the lane in which the collision occurred was *not* based upon whether the skid mark was in fact made by the left rear tire of the Cadillac. As noted above, the professor stated his opinion was based upon the trail of debris leading to the front of the Cadillac. The evidence is uncontradicted that this debris began on the east [Cadillac's] side of the center line and ended on the west side where the front of the Cadillac came to rest.

Further, he stated that it was a physical impossibility for the Cadillac to have been moved laterally four feet

(as was testified to by one of the experts), and then proceed down the road to its final resting place as the liquid debris indicated it did.

Finally, he stated several times on cross-examination that the skid mark was not the basis for his opinion that the collision occurred in the Cadillac's lane, but was merely corroborating evidence. This is demonstrated by the following exchange during his cross-examination:

"*Q.* Let me ask you this, Professor: Do you base your opinion in any degree that the impact occurred in the Cadillac's lane upon the assumption that the tire mark is from the left rear wheel?

"*A. No, I look on it solely as a corroborating fact.*

"*Q.* So we can remove that factor from the basis of your opinion, is that correct?

"*A.* It is a factor which re-enforces my opinion. It is a factor that makes me confident in this.

"*Q.* I just really want to know, do you rely upon your opinion, as you stated, that the tire mark is from the left rear? Do you rely upon that assumption or that conclusion in arriving at your opinion that the accident happened in the Cadillac's lane? Now, can you answer that question?

"*A.* No, I don't.rely or depend on that being the left rear wheel. I rely on the fact that the droppings are on the—

"*Q.* You've said that." (Emphasis added.)

The witness was permitted to finish his answer and he again stated his opinion was based upon "the indisputable path that the droppings from the engine compartment left on the pavement as clearly seen on this photograph . . . ." (All witnesses, including the investigating officer, agreed as to the location of the debris path.)

b. *Skid mark.* Professor Van Vleet also stated it was his opinion that the skid mark was made by the left rear wheel. The reason offered on direct was that the photographs showed the track leading from some liquid

debris at the bottom of the picture up to the left rear wheel and that the left rear was the only wheel that could have gone through the debris. But he further stated:

> *"Another reason* for thinking that this is made by the left rear wheel is the fact that in these photographs the tire print terminates at the left rear wheel and shows it making a slight turn at the end and going in under the left rear wheel. I can see no extension of that skid underneath the car and it would be characteristic of a car which is coming to rest essentially in its final position to have just some small amount of lurch left in it to roll back, because that is down the incline there." (Emphasis added.)

General Casualty contends that this opinion is based on pure speculation since (1) Van Vleet, on cross-examination, stated that his opinion was based on his conclusion that the collision occurred in the Cadillac's lane and (2) Van Vleet stated that the left rear wheel was the only wheel which could have gone *through* the debris, although he stated he could not trace the track *through* the debris, and that it would be impossible to tell where the mark began. The relevant photographs, however, do show the skid mark leading back *to* this debris and neither this aspect of the photos nor the photos themselves are objected to.

The admission by Van Vleet of speculation, which is noted by appellant, was only that any attempt to determine *whether the wheel was rolling and was thereby covered with the debris* in its entire circumference would be mere speculation. (It was, of course, entirely possible, and very probable, that the wheel skidded from the debris to its final resting place.) Professor Van Vleet did not state that it was speculation that the wheel mark came from the debris, and the photographs indicate that the track can be traced to the debris.

Further, Professor Van Vleet emphasized, as another basis of his opinion respecting the skid mark, the "curve" or "definite short curlicue leading to the final resting point of the left rear wheel of the Cadillac." He stated:

"If this [the tire mark] were definitely from the right rear tire, I would be faced with a conflict of physical facts, and I wouldn't offer an opinion [as to where the impact occurred] in such a case."

Therefore, Professor Van Vleet's opinion as to the collision lane was based upon facts in evidence: photos, uncontradicted testimony as to the trail of liquid debris, the final resting place and position of the Cadillac, etc. His further opinion was based in part on this opinion, the trail of debris, that the Cadillac rotated counter-clockwise, the laws of physics, and the photographic evidence admitted without objection. The answers elicited from him on cross-examination go to the weight of his testimony, not to its admissibility; [2] they do not establish that his opinion was completely unfounded.

In any event, excluding Professor Van Vleet's opinion as to which wheel made the skid mark, there is more than sufficient evidence to support the jury's verdict. The error, if such, was not prejudicial.

c. *Drawing in Center of Gravity.* Much testimony was elicited from Professor Van Vleet on cross-examination regarding the path which the center of gravity of the Cadillac followed after impact. On redirect, Professor Van Vleet was permitted to draw in the path on an exhibit. This was not new evidence, since the professor had already testified to this, and appellant does not here contend that the line and circles drawn do not accurately represent his testimony. As noted in Jones, *Evidence,*[3] cited by appellant in its brief:

[2] *Rabata v. Dohner* (1969), 45 Wis. 2d 111, 172 N. W. 2d 409.

[3] 4 Jones, *Evidence* (5th ed.), p. 1808, sec. 961.

". . . On reexamination, the witness may be allowed *to reaffirm or explain* his statements, their meaning or import, and to minimize or destroy discrediting tendencies."

It does not appear that it was an abuse of discretion to permit Professor Van Vleet to clarify his testimony to the jury. Appellant elicited the testimony on cross-examination; he should not object to making it clearer to the jury by putting it accurately on a diagram.

## 2. *Scuff marks.*

General Casualty contends that witness Van Vleet was allowed to testify as to "possibilities" when offering an opinion as to the presence of "scuff marks" made by the right rear tire in the gravel off the pavement on the east side of the highway.

To consider this contention it is first necessary to recount here the context in which the testimony occurred.

Officer Willing, the investigating officer, first testified that the collision occurred in the Pontiac's lane and that the skid mark came from the Cadillac's right rear wheel, his opinion being based in part on his failure to find any evidence of "scuff marks" on the gravel which would have been made by the right rear tire had the skid mark been made by the left.

Professor Easton then testified that the collision occurred in the Pontiac's lane (the west side of the highway), basing his opinion quite heavily on his further opinion that the skid mark came from the right rear wheel (permitted because of the testimony of Officer Willing).

On direct examination, Professor Van Vleet, after stating his opinion that the collision occurred in the Cadillac's lane and that the skid mark was made by the left rear wheel and explaining his reasons, stated:

"*A.* I do see on Exhibit 22–A something that could very well be a mark, scuff mark, left by the right rear wheel because certainly they had to cross on this swing somewhere. And there are some marks that you will note in this 22–A and also over in here (indicating).

"*Q.* Which exhibit is that?

"*A.* This is 1–A. . . ."

This testimony was not objected to.

On cross-examination he admitted that the crossing of the lines of travel of each of the wheels may never have occurred in this instance, because "it stopped just beyond 90 degrees and I don't think there's a crossing point visible." He then went on:

"But I think I can show what I believe to be the skid mark of the right rear wheel on one of these photographs, relative to the other visible tire tracks.

"*Q.* Well, when Mr. Frauen asks you again on redirect, maybe that would be the time to do that. . . ."

The following day, on redirect, counsel for Badger State asked:

"*Q.* Yesterday Mr. deVries suggested that I ask you to point out to the jury where you thought the pictures show what might be a scuff mark from the right rear tire. . . ."

After objections, including one by appellant that "he is being asked to point out where something possibly could have taken place . . . ," the professor was allowed to point out these "marks" on a photograph and he did so. General Casualty now contends that it was prejudicial error to permit this testimony since it was framed in terms of mere possibility, *i.e.,* "could very well be a mark, scuff mark, left by the right rear wheel . . . ." We find no merit in this contention for several reasons:

1. The witness was not offering an opinion that these marks were in fact made by the right rear wheel; nor

did it in any way affect his opinion with respect to the collision lane or the skid mark.

2. It is clear that a contrary opinion to that presented by an opposing party may be presented in terms of possibilities:

"(1) **Contrary Opinion May be in Terms of Possibility.** Although the party with the burden of proof must produce testimony based upon reasonable medical probabilities, the opposing party is not restricted to this requirement and may attempt to weaken the claim for injuries with medical proof couched in terms of possibilities. Thus, it is proper to cross-examine a plaintiff's medical witness on matters which do not rise to the dignity of 'reasonable medical probability.' " [4]

The witness, Van Vleet, was offering testimony to depreciate the testimony of Professor Easton [5] and Officer Willing. One defendant may weaken, by direct testimony of its own expert, an opinion presented by another defendant with opposing interests. [6]

3. The testimony on redirect was merely a reiteration of testimony previously given by Professor Van Vleet, without objection, on direct examination. Counsel con-

---

[4] Mallare, *Wisconsin Civil Trial Evidence* (1967), ch. 4, p. 133, sec. 4.46. *See also: Hernke v. Northern Ins. Co.* (1963), 20 Wis. 2d 352, 360, 122 N. W. 2d 395.

[5] In *Kuzel v. State Farm Mut. Automobile Ins. Co.* (1963), 20 Wis. 2d 558, 123 N. W. 2d 470, this court was also faced with a case involving scuff marks and an expert's opinion as to the reconstruction of an automobile accident. In that case Professor Easton based his opinion on the absence of scuff marks. The supreme court found there was no evidence of the absence of scuff marks and reversed. In the instant case evidence pointing to the presence of scuff marks would bear materially on any inference that such marks were not present.

[6] In *Lambrecht v. State Highway Comm.* (1967), 34 Wis. 2d 218, 148 N. W. 2d 732, the defense was permitted to weaken by direct testimony of its own, an expert opinion presented by the plaintiff. The principle is equally applicable here.

tends that Van Vleet did not indicate to the jury the scuff marks he observed on the photograph; he urges Van Vleet showed them only to counsel. The record does not substantiate this.

4. Indeed, counsel for General Casualty suggested on cross-examination that Professor Van Vleet wait for redirect to bring out his testimony concerning the existence of these marks.

It is not reasonable to assume the jury was misled by this testimony to such an extent as to affect its verdict. Professor Van Vleet testified the collision occurred in the Cadillac's lane based on the trail of debris and not based on the skid mark. The only relevance the scuff marks had was to the skid mark. It cannot be said that but for this testimony the verdict might probably have been different.[7]

In *Lorenz v. Wolff*,[8] cited by appellant, this court ordered a new trial in the interest of justice under sec. 251.09, Stats., even though it could not be said that on a new trial the plaintiff there would probably win. That case is readily distinguishable from this because the errors there went to the heart of plaintiff's case, whereas here this testimony was hardly, as appellant contends, "determinative of liability."

3. *Exclusion of Gerald Peil's statement made to police detective.*

At trial Gerald Peil testified that he was in the rear seat of the Cadillac, was sleeping, and saw nothing of the Roubal car prior to the collision. On cross-examination he stated he did not know whether he was sitting or lying down, but that he was told he was lying down with his head in Suzanne Felde Peil's lap; he further testified he could not remember an interview with police after the

[7] *Carson v. Pape* (1961), 15 Wis. 2d 300, 112 N. W. 2d 693.
[8] (1970), 45 Wis. 2d 407, 173 N. W. 2d 129.

accident, nor, more specifically, did he remember telling them he was necking with Suzanne and had no idea how the accident happened.

Thereafter, during a recess, Suzanne Felde Peil's counsel requested that the court exclude a statement made by Gerald Peil to a Detective Casciaro that he was "necking" with Suzanne Felde Peil at the time of the collision, had no idea of how the accident happened except that it happened while Kohnke "was making a right turn." The objection to the testimony was on the grounds that (1) it was hearsay as to Suzanne Felde Peil, and (2) the impeachment went to an immaterial issue, *i.e.*, whether Gerald Peil was sleeping or necking.

The court excluded it stating:

"The Court: I say if the impeachment consists of what has been represented here, the question of whether the man was sleeping or sitting up or necking, I'm going to exclude it.

"[Appellant] : Well, fine. I'll make my offer of proof."

In its decision on motions after verdict, the court ruled the exclusion was proper because (1) the point was irrelevant and immaterial, and (2) although it might impeach Suzanne Felde Peil, it was hearsay as to her.

Was this error? We think not, and for several reasons:

1. The statement was not material.[9] At trial Gerald Peil testified that he did not know how the accident occurred. In the offer of proof the evidence was that Gerald Peil did not know how the accident occurred since he was necking with Suzanne Felde Peil, but that Kohnke was turning to the right. (It is clear that the collision occurred just after the Kohnke automobile came out of a curve to the right.)

---

[9] "The impeaching statement must be concerned with a 'material' and not a 'collateral' matter." Mallare, *Wisconsin Civil Trial Evidence, supra*, footnote 4, ch. 3, at page 91, sec. 3.413(1).

2. The statement was hearsay as to Suzanne Felde Peil. The only purpose for which it was admissible here in any event was to impeach Gerald Peil. It would also tend to impeach Suzanne Felde Peil. One cannot impeach a witness by hearsay statements.

3. The trial court indicated further, in light of the case as a whole, it would exclude the testimony. Under Rule 303 of the *Model Code of Evidence,*[10] the trial court is permitted in its discretion to exclude testimony when it determines its probative value is outweighed by its potentially prejudicial effect on the jury. ". . . In dealing with evidence of slight probative value, the trial court is given wide discretion."[11]

Here there was no issue whether Peil made a statement, whether he was necking or sleeping, whether he had his head in another's lap or not. The issue was who caused the accident, and Gerald Peil, both at trial and in the offer of proof, stated he had no knowledge. Even assuming that the offered statement (including that Kohnke was "making a right turn"), was relevant, the trial court did not, under the circumstances, abuse its discretion by excluding it.

## II. Damages

4. Was it error to exclude a hospital record of Larry Melcher and to instruct the jury that it was to disregard all testimony regarding a past altercation in which his nose was fractured and deformed?

5. Can an award for impairment of future earning capacity be supported without medical testimony linking the injury to the loss of future earning capacity?

[10] Adopted in *Whitty v. State* (1967), 34 Wis. 2d 278, 149 N. W. 2d 557.

[11] *Olson v. Hardware Dealers Mut. Fire Ins. Co.* (1970), 45 Wis. 2d 569, 578, 173 N. W. 2d 599.

4. *Injury to Larry Melcher's left eye.*

Plaintiff-respondent Larry Melcher, a passenger in the Kohnke Cadillac, was seated in the right front seat next to the window. He testified to recurring headaches in his left temple and that he was unable to see clearly with his left eye after the accident. Other injuries and damages awarded therefor are not in dispute. He also testified to taking a fall down some steps in his home after the accident, although he stated only his lower body hit the floor and he did not hit a door or anything. He did not remember discovering his eye difficulty before this fall.

Dr. Samuel S. Blankstein, a licensed ophthalmologist, was qualified and testified as an expert medical witness. The history he received from Melcher recounted the automobile accident and the fall, and that on the day following the fall he noticed the impairment of his vision. Dr. Blankstein's examination, on August 9, 1965, disclosed that the vision in Melcher's left eye was extremely defective, and that the left eye had a large blind spot in its center vision. A subsequent examination in February, 1967, disclosed no improvement in the vision of the left eye. Dr. Blankstein determined that Melcher had received a direct blow to the left eye which caused the injury, and that the effect was permanent.

On cross-examination, Dr. Blankstein stated that the injury to the left eye had to come from "a forceful blow directly to the eyeball" but that he could not state precisely how much of Melcher's present condition was a result of the fall and how much of the automobile accident. He stated that a trauma of the sort described by Melcher in falling in his home would not produce this type of injury, and he also stated that the fall probably had an effect on his vision and aggravated the original injury. The medical probability, however, was that "the direct blow to the eye in the automobile accident is what

caused his difficulty." He stated that this opinion was predicated on the fact that these were the only two traumas to the eye reported to him.

Dr. Blankstein did state that being hit directly in the eye with a fist could cause such an injury.

General Casualty recalled Melcher, and under adverse questioning Melcher testified that he did not remember being hospitalized in November, 1964, for an injury to his face resulting from a fight, and that he never had a fracture to his nose or injury to his eye from a fight. General Casualty then produced hospital records indicating Melcher was brought to a hospital on November 27, 1964, and that the history stated: "Injured nose. Hit with a fist. Deformed nose to the left." The treatment therefor was also indicated.

Various objections were interposed by counsel and a discussion had without the jury. The court then instructed the jury, in referring to this hospital record:

". . . I want to say to you that you may not infer from this testimony that the plaintiff, Larry Melcher, also referred to as Wayne Melcher, sustained any impairment of his vision as a result of the altercation and the circumstances and the injuries for which he . . . received treatment. In that connection all testimony relating to that altercation and that injury and that treatment is stricken and you are to disregard it."

Appellant contends this was prejudicial error. (It should be noted that the court did not state the testimony could not be considered for impeachment purposes, as appellant contended it could be. And the court admitted hospital records of treatment for other falls as relevant to Melcher's headaches.)

The reason the court offered for the exclusion was stated:

"[I]t's my ruling that a jury may not draw an inference that Mr. Melcher received any impairment to his

eyesight in the nature that has been testified to here as a result of being struck in the nose. It seems to me that without anything in this case other than a mere statement in a hospital that he was struck in the nose and the nose was pushed from the left to the right, that a jury would be doing nothing but sitting down and playing doctor and they would be speculating and conjecturing. Now, that's my conclusion."

There was no abuse of discretion in this ruling. As noted in Mallare, *Wisconsin Civil Trial Evidence:*

"(1) **Contrary Opinion May be in Terms of Possibility.** Although the party with the burden of proof must produce testimony based upon reasonable medical probabilities, the opposing party is not restricted to this requirement and may attempt to weaken the claim for injuries with *medical proof* couched in terms of possibilities." (Emphasis added.) [12]

Appellant contends that the jury should have been allowed to infer from this evidence that Melcher was struck in the eye in such a way as to have caused the injury to his eye. More than this would seem necessary; however, Dr. Blankstein had testified that only a direct, severe blow to the eye could have caused the plaintiff's injury. Nothing in the objectionable hospital records indicated any injury to Melcher's eye, nor any complaints or treatment to the eye. Appellant made no attempt to question Dr. Blankstein with respect to these records, even though he knew he would produce them. Nor did he offer the testimony of any other medical expert. Without some evidence of this type, the trial court did not abuse its discretion in limiting the purpose of the testimony.

5. *Future earning capacity of Suzanne Felde Peil.*

Appellant contends that there was not sufficient evidence to send the question of the plaintiff-respondent

---

[12] *Supra,* footnote 4.

Suzanne Felde Peil's loss of future earning capacity to the jury. At the time of the accident she was sixteen years of age, had a grade school education, and had never been employed prior thereto. By the time of trial she was nineteen years of age, the mother of two children, and had worked sporadically after her convalescence.

At the trial Suzanne Felde Peil testified currently she had some back pains and headaches two or three times per week for which she took no medication but aspirin.

Although there was conflicting medical testimony as to her physical condition and the permanency of the residuals resulting from her injuries, taking the evidence in the light most favorable to the verdict, the record establishes that her back injuries are permanent; that the residual fatigue from the surgical removal of a ruptured spleen is permanent; headaches associated with a brain concussion and post-concussion syndrome are permanent.

As to her work experience after the accident, Mrs. Peil stated she began a job with the laundry department of the Milwaukee Athletic Club in January of 1967, but that she was required to be on her feet all the time, lifting and bending, which she could not do because her back pained her. She testified she was fired because she was frequently absent from work because of her disability. An employee of the Milwaukee Athletic Club in charge of personnel records testified that his records indicated plaintiff was removed from payroll two weeks after she was hired and her employment terminated because she was "not dependable."

Mrs. Peil was rehired five months later and worked for two months whereupon she was fired because she was "Never at work." Her work application was admitted into evidence. The application states she was in good health and suffered from no disability, and was signed by Mrs. Peil.

Mrs. Peil further testified that she subsequently took a job in a restaurant where she worked eight weeks before

quitting because she was too fatigued. She was required to be on her feet all the time. She later returned to the same job but quit after two weeks for the same reasons. She has not worked since, and does only light housework while her mother does the heavier.

In its decision on motions after verdict, the trial court concluded that the evidence of permanent injury, combined with evidence of plaintiff's education and qualifications, the nature of her injuries, and her testimony as to her employment after the accident constituted sufficient evidence to constitute a jury question as to plaintiff's loss of future earning capacity, citing *Wells v. National Indemnity Co.*[13]

Evidence of prior employment or earnings is not necessary to sustain a verdict awarding damages for loss of *future* earning capacity,[14] although such evidence may, of course, be helpful to the jury in arriving at the amount of damages. It is equally well settled that "a permanent injury in and of itself does not necessarily prove or indicate a loss of earning capacity or serve as a factual basis for an inference in every case." [15]

Appellant contends, and the trial court agreed, that there is affirmative evidence of *no* impairment of earning capacity. However, the trial court also concluded that there was also affirmative evidence of such impairment and that the question was properly presented to the jury. Appellant now contends that *Ianni v. Grain Dealers Mut. Ins. Co.*[16] requires that the presumption of the impairment from evidence of a permanent injury must be based either (1) on common knowledge that the injury disables the plaintiff from performing the only type of work he

---

[13] (1968), 41 Wis. 2d 1, 162 N. W. 2d 562.

[14] *Allen v. Bonnar* (1963), 22 Wis. 2d 221, 225, 125 N. W. 2d 570. *See also: Illinois Central R. R. v. Staples* (8th Cir. 1959), 272 Fed. 2d 829, 832.

[15] *Wells v. National Indemnity Co., supra,* footnote 13, at page 11.

[16] (1969), 42 Wis. 2d 354, 166 N. W. 2d 148.

is fitted to do, or (2) *medical testimony* linking the injury to the future loss.

Appellant misreads *Ianni*. In that case the court said:

> "We are concerned here more with the proper basis being established for *measurement of damages* than with the eligibility to damages based on having sustained a permanent injury. Where the nature of the permanent injury by common knowledge disables the plaintiff from performing the only type of work he is fitted to do, compensability follows, according to *Wells v. National Indemnity Co., supra,* unless there is affirmative evidence that there was no impairment of earning capacity, as in *Neider v. Spoehr* (1968), 39 Wis. 2d 552, 159 N. W. 2d 587." (Emphasis added.) [17]

Further, appellant's contention that the additional affirmative evidence required must be medical evidence was disposed of in *Krause v. Milwaukee Mut. Ins. Co.,*[18] where the plaintiff claimed the absence of medical testimony made the jury award for loss of future earning capacity mere speculation. The court did not find the argument persuasive.

In *Krause* there was affirmative evidence that the plaintiff worked on his old job for nine months after his injury with no impairment of earnings during the period, although there was also evidence that this was the result of his employer's benevolence. The court went on to state:

> "Evidence in this case establishing lack of future earning capacity is minimal in comparison to plaintiff's work record prior to the trial and the fact his earnings had not been impaired during that period. However, this court has recognized the difficulty involved in attempting to establish future loss of earning capacity and has held that only when there is *no* such evidence will the jury be precluded from considering the issue. In *Spleas v. Milwaukee & Suburban Transport Corp.* (1963), 21 Wis. 2d

[17] *Id.* at pages 364, 365.
[18] (1969), 44 Wis. 2d 590, 172 N. W. 2d 181.

635, 124 N. W. 2d 593, the only evidence of loss of earning capacity was plaintiff's testimony that he could not always do his regular work and had received only a few small pay raises since the accident while other employees had received more. Nevertheless, this court held there was no error in giving an instruction on loss of earning capacity as damages. The holding made clear that the quantum of proof required to sustain a finding of loss of future earning capacity is not as great as that required in other damage issues." [19]

*New trial in interest of justice—liability and damages.*

Appellant urges this court, under sec. 251.09, Stats., to grant a new trial in the interest of justice because of the accumulation of error not only as to the issues previously considered but others. We find no merit in this contention.

a. *Striking testimony of Officer Willing that the skid mark was made by the Cadillac's right rear tire.* The court excluded the specific testimony involved on the ground that Officer Willing was not competent to render an opinion. There was considerable discussion on this question in chambers wherein one of plaintiff's counsel moved to strike the opinion of Officer Willing as to the collision lane. Earlier, Officer Willing had testified that the collision occurred in the Pontiac's lane; no objection was made. After hearing the arguments, there was some discussion off the record. The court then stated:

"The court will deny the motion and at a later time either read into the record a memorandum or a separate memorandum of the reasons for its ruling."

(The memorandum does not appear.)

Later in the testimony, appellant asked the officer if this was not his testimony. There were objections, but the court allowed the question noting that Officer Willing had so testified.

---

[19] *Id.* at page 616.

After a three-day adjournment the trial resumed with a question from appellant regarding Officer Willing's testimony as to the skid mark. There were objections and several attempts to rephrase the question. Finally, the officer stated the skid mark did not come from the left rear wheel. An objection was sustained and the testimony stricken, with a comment from the court:

". . . Now, the officer can testify as to what he saw and I've indicated that not only this morning but last week in the proceeding."

Apparently, then, the court limited the officer's testimony with regard to competency. This is within the discretion of the trial court [20] and no abuse is apparent here. Nor would such abuse be prejudicial, since appellant presented two experts who testified that the collision occurred in the Pontiac's lane and that the skid mark was made by the right rear wheel.

b. *Limiting cross-examination of plaintiff Kathleen Star Darga with respect to criminal convictions.* On cross-examination, when this plaintiff, Kathleen Star Darga, was asked if she had ever been convicted of a crime, the court explained what a crime was, and she denied she had ever been convicted. She was later recalled to the stand and at that time asked whether she had been "in trouble with the law" in December, 1965, and she admitted she had; she was then asked whether that had "anything to do with money" and she stated it had. An objection was sustained to the question whether the money was hers or someone else's. A discussion out of the jury's presence reveals some confusion as to the witness's understanding of "a crime." (And may be as to the law on impeachment.) In any event, when the trial resumed, appellant asked whether the witness had ever been convicted of a crime and she admitted she had.

[20] *Simpsen v. Madison General Hospital* (1970), 48 Wis. 2d 498, 180 N. W. 2d 586.

There was no subsequent attempt to inquire into the nature of the crime.

On this record, we find no abuse of discretion by the trial court in limiting the cross-examination of this party. Neither do we see any possible prejudice to appellant resulting from this ruling. Kathleen Star Darga did admit the crime, which is what appellant desired; her credibility was, in theory, affected thereby.

c. *Permitting Dr. Blankstein to testify as to what would happen if plaintiff Larry Melcher lost the use of his right eye in the future.* In examining Dr. Blankstein with respect to plaintiff Larry Melcher's injury, his counsel asked the doctor ". . . in what respect this condition of being will affect Mr. Melcher in his future life?" The doctor replied, over objection:

"Well, as long as he has good vision in his right eye, he will be able to get along quite well because he has side vision in his left eye but if he should ever lose the vision in his right eye—
". . .
"The vision in the left eye would be so poor that in case he lost the vision of his right eye that he would be unable to read, he would be unable to carry on any occupation that would necessitate vision above what we call industrially blind . . . ."

In its decision on motions after verdict, the court stated it felt the form of the question was improper, but that the testimony was not objectionable. Even if this testimony was speculative, appellant was not prejudiced thereby since Dr. Blankstein had already testified that Melcher had a large blind spot in his left eye, could not count fingers at two feet with his right eye covered, but that his side vision was normal; this condition was permanent. That subsequent loss of vision in his right eye would result in industrial blindness was not speculation, but fact; that he would lose the vision in his right eye was speculation.

Considering the entire record we are satisfied that the jury verdict as to liability and damages was amply supported by the evidence and that justice has not miscarried. As to the liability and damages phases of the trial, we find no prejudicial error and decline to order a new trial under sec. 251.09, Stats. The judgments of the trial court as to these phases of the cases, therefore, must be affirmed.

### III. Coverage

After the accident of June 21, 1965, Badger State sought to avoid coverage on the grounds that coverage on the 1965 Cadillac was issued only because of certain material false representations made to its agent: *i.e.,* Badger State contends (1) that Delmar Kohnke was not in fact the owner of the 1965 Cadillac driven by Frank Kohnke at the time of the accident, but that Frank Kohnke was the owner in fact, although the car was titled in Delmar Kohnke; (2) that Frank Kohnke, not Delmar and/or Mrs. Delmar (Lois) Kohnke, was the principal driver of the car.

Delmar Kohnke owned a 1964 Rambler which he insured with Badger State through the Micheal A. Durante Agency. On November 11, 1964, Delmar Kohnke orally requested the agent to include coverage on a 1962 Cadillac, titled in his father, John Kohnke. Delmar Kohnke told the agent, Micheal Durante, that he owned or would own the car and that he and his wife would be the principal drivers. No mention was made of Frank Kohnke in connection with this car. On the basis of this information, Badger State then issued the policy with a special rate for multiple-car coverage.

On February 19, 1965, the Kohnkes (there is some question as to which one: Delmar Kohnke testified he did, Lois Kohnke, that she did, and the agent that

Delmar Kohnke did) orally notified Durante to switch the coverage on the 1962 Cadillac to a 1965 Cadillac. They advised Durante that the title was in the name of Delmar Kohnke, that he was the owner, and that the principal users of the car would be the same—in short the coverage was to be the same as on the 1962 Cadillac. Again, no mention was ever made of Frank Kohnke in connection with this car. In fact, Durante never had any dealings with Frank Kohnke. The coverage was tranferred as requested and the policy was subsequently renewed for six months on April 25, 1965. Therefore, it was in force, if valid, at the time of the accident.

Further facts will be stated later in this opinion.

This coverage appeal is resolved by our analysis and conclusion on a single issue:

6. *Whether, considering the entire record, as a matter of law, false representations were made by Delmar Kohnke as to material facts.*

The law is settled that in order for a carrier to successfully avoid coverage on the ground of misrepresentation, it must prove (1) that the representation was false; and (2) that the false representation was made with intent to deceive, or was material, *i.e.*, it increased the risk or contributed to the loss.[21] The existence of each of these elements is a question of fact including the materiality of the false representation.[22] This does not pre-

[21] Sec. 209.06, Stats.; *Langlois v. Wisconsin National Life Ins. Co.* (1963), 19 Wis. 2d 151, 157, 119 N. W. 2d 400, 120 N. W. 2d 884; *Stockinger v. Central National Ins. Co.* (1964), 24 Wis. 2d 245, 128 N. W. 2d 433.

[22] *Id.* The test of materiality is stated in *Stockinger* at page 253: ". . . The real test is not that the insurer was influenced, but rather that the fact, if truthfully stated, might reasonably have influenced the insurer in deciding whether it should accept or reject the risk. *Haas v. Integrity Mut. Ins. Co.* (1958), 4 Wis. 2d 198, 203, 90 N. W. 2d 146."

clude a court from finding one or all of these elements to be proven as a matter of law.[23]

At the trial the trial court framed a single question on the subject of the alleged false representations as follows:

"Did the defendant, Delmar Kohnke, falsely represent to the Badger State Mutual Casualty Company any material facts concerning the ownership or use of the 1965 Cadillac automobile?"

Badger State requested the trial court to find that, if false representations were in fact made, then, as a matter of law these false representations were material.

The trial court refused to so find or instruct and the jury answered "No" to the single question in the verdict.

A post-trial motion was then made by Badger State to change the answer of this question from "No" to "Yes" and for judgment *non obstante veredicto (n. o. v.)*, alleging that as a matter of law false representations were made and as made, were material.

On this review we must focus our inquiry on two different matters: (1) were false representations made, and (2) if so, were they material.

In this review, of course, we must look at the evidence in a light most favorable to the verdict.[24] Our review is hampered by the fact that the trial court framed but a single question and instructed the jury, over objections by Badger State, to wit: If the jury found that false representations were made they were also to determine whether these representations were made with intent to deceive Badger State or were material to the risk.

Thus, in order for us to decide whether the trial court erred in giving this instruction, we must determine

[23] *See, e.g., Bade v. Badger Mut. Ins. Co.* (1966), 31 Wis. 2d 38, 142 N. W. 2d 218 (summary judgment).

[24] *Delaney v. Prudential Ins. Co.* (1966), 29 Wis. 2d 345, 349, 139 N. W. 2d 48.

whether the evidence or reasonable inferences drawn therefrom support but one conclusion of materiality.[25] If so, then there was error in giving that instruction. But even if the representations were material as a matter of law, we must go further in our analysis of the alleged error in rejecting the requested change of jury answer. We must determine whether the evidence or reasonable inferences drawn therefrom support a single conclusion that false representations were in fact made. If so, then the jury's answer to the false representation question should have been changed by the trial court from "No" to "Yes" and judgment granted accordingly under which Badger State avoided coverage.

Our detailed analysis of the evidence, much of it documentary, establishes beyond any question that false representations were made and they were very material. The oral assertions in early 1965 by Delmar Kohnke that he was the owner of the 1965 Cadillac and that he and his wife, Lois, were principal drivers of that car are rendered incredible by the web of evidence, mostly documentary, clearly establishing either an ownership interest of Frank Kohnke in that car or an interest of Frank as principal driver. Badger State was misled by false representations into giving coverage which substantially increased its risk. It should not be held to coverage here.

Our analysis of the evidence establishes the following sequence of events:

1. In January, 1961, Frank Kohnke purchased a 1961 Buick convertible from Quinlevan Buick Company in Milwaukee (Exhibit 49). A 1958 Cadillac was traded in on the purchase (Exhibit 53). This car was financed by General Motors Acceptance Corporation, with Barbara

[25] *Id.; Slattery v. Lofy* (1969), 45 Wis. 2d 155, 157, 172 N. W. 2d 341.

Kohnke (Frank Kohnke's wife at that time) and John Kohnke (Frank's father) cosigning (Exhibit 49). The loan was paid in full on March 25, 1963.

2. On March 19, 1963, Frank Kohnke purchased a 1962 Cadillac convertible from Arrow Oldsmobile, Inc. in Cudahy (Exhibit 77). The car was financed by GMAC in the amount of $4,030.20. No copurchaser or guarantor appears of record. A net balance of $1,628.52 (after rebate of interest) was paid by check from Allen-Bradley Employees Credit Union on January 20, 1965 (Exhibit 50).

3. On January 17, 1964, an application for insurance on the 1962 Cadillac was made with the Ohio Casualty Insurance Company and a policy issued. The named insured was John E. Kohnke (Exhibit 60). The salesman who took the application testified that all of his dealings were with Frank Kohnke, who indicated he would be the only driver. The salesman asked him his occupation and Frank Kohnke told him he worked at Allen-Bradley; he did not say he was also a bartender. The policy was cancelled effective April 4, 1964, because the company's investigation disclosed Frank Kohnke was a bartender (Exhibit 60).

4. On May 8, 1964, an application was made to Continental National Insurance Group for automobile liability insurance on the 1962 Cadillac. The application indicates John E. Kohnke as the owner but not the driver. The policy was issued but cancelled on July 21, 1964 (Exhibit 56). The file put in evidence indicates that an investigation disclosed Frank Kohnke had been arrested and charged with attempted aggravated battery and theft from the person; that he had in the past been a bartender. The file also contains evidence that the cancellation was a matter of some urgency to the company. Although it was later established that the charges were dismissed (Exhibits 81 and 82), the arrests were enough for the company.

5. On November 16, 1964, the 1962 Cadillac was included under a policy which Delmar Kohnke had with Badger State on his 1964 Rambler (Exhibit 68A). This was orally accomplished by Delmar Kohnke with a phone call to Mr. Durante, his insurance agent.

Mr. Durante testified that Delmar Kohnke told him the car was in his father's name, but that he owned it by virtue of his father's death. An earlier signed statement given by Durante (Exhibit 10) which was read into the record corroborates his testimony. Delmar Kohnke testified on rebuttal that he went to Durante's office, told him his father was in ill health, not dead, and that Durante told him he could insure the car and use it seeing "I was down at Waukesha now." John Kohnke was alive at the time of the trial.

Durante testified he told Delmar Kohnke that he could get a special rate, a multiple car discount, for the two cars if he were the owner and only if he and his wife were the principal drivers; that Delmar Kohnke assured him that was the situation. One of the exhibits (68A) states these facts and also indicates a special rate was granted.

Frank Kohnke was never mentioned. Both Delmar Kohnke and his wife Lois Kohnke testified Durante did not ask them about Frank.

6. A used-car appraisal slip from the files of Metropolitan Cadillac in Milwaukee (Exhibit 23) indicates that on January 13, 1965, an appraisal was made on a 1962 Cadillac convertible for Frank Kohnke; the appraisal indicated a value of $2,435.

7. A motor vehicle purchase contract from the files of Metropolitan (Exhibit 25) signed by Frank E. Kohnke indicates that he gave a deposit of $50 (Exhibit 36, receipt to Frank Kohnke in the amount of $50, dated January 16, 1965) for the purchase of a 1965 Cadillac convertible, on which is noted a credit in the amount of $2,903.45 for a trade-in of a 1962 Cadillac convertible. The net pur-

chase price was $3,390.20, including the state sales tax (Exhibit 25).

8. On January 16, 1965, the car was delivered to Frank Kohnke (Exhibit 24), and he signed a conditional sales contract (Exhibits 26, 27) indicating the balance of $3,390.20 would be paid on January 20, 1965. Another finance document of this date indicates the net balance of $3,390.20 was to be paid on January 20, 1965 (Exhibit 28).

Another document of the same date, entitled "Motor Vehicle Dealer Statement of the Tax Payment" (Exhibit 29), names Frank Kohnke as the purchaser of the 1965 Cadillac and states that he paid the state sales tax of $100.20.

All of the documents noted here name Frank Kohnke as the purchaser and indicate that a 1962 Cadillac was traded in on the purchase.

9. Another document (Exhibit 30) executed at approximately this time (most likely the same day) is entitled "Motor Vehicle Department—Application for Duplicate Certificate of Title." The car named therein is the 1962 Cadillac convertible traded in by Frank Kohnke. In the box designated "Personal Signature of Registered Owner or Owners" is the signature: "John E. Kohnke." Frank Kohnke had previously testified that he had signed his father's name to this document concerning the 1962 Cadillac.

10. On January 19, 1965, Frank Kohnke obtained a loan from the Allen-Bradley Employees Credit Union in the amount of $3,000 to purchase a 1965 Cadillac convertible and pay off previous auto financing with GMAC (Exhibits 58B, 76). Two checks were issued by the credit union: (1) to Metropolitan Cadillac, Inc., in the amount of $1,371.48; and (2) to GMAC in the amount of $1,628.52.

11. A receipt from Metropolitan Cadillac, Inc., made out to Frank Kohnke, dated January 19, 1965, indicates

payment by three checks in the total amount of $3,390.20 (Exhibit 35).

12. On January 20, 1965, the net balance of $1,628.52 due and owing GMAC on the account of Frank Kohnke was paid in full by a check from the Allen-Bradley Employees Credit Union (Exhibit 50). The lien on the 1962 Cadillac convertible was released to Metropolitan Cadillac.

Frank Kohnke testified, however, that he owed no money to anyone, other than possibly his father, on the 1962 Cadillac when it was traded in on the 1965 Cadillac.

13. A receipt from the Wisconsin motor vehicle department, dated January 21, 1965, and made out to Delmar C. Kohnke, acknowledges receipt of $17 in cash (Exhibit 38). (This undoubtedly was for title and license plates; no "license number" is indicated on the receipt.)

14. On February 19, 1965, the "Change of Car Endorsement" was issued by Badger State to change the coverage in the name of Delmar C. Kohnke from the 1962 Cadillac to the 1965 Cadillac convertible (Exhibit 1). The coverage was renewed on April 25, 1965 (Exhibit 2).

15. Repair records from the file of Metropolitan Cadillac, Inc., indicate servicing of the 1965 Cadillac convertible five times between January and May of 1965, and that each time the car was brought in by Frank Kohnke (Exhibits 39–43).

16. The salesman who sold Frank Kohnke the 1965 Cadillac testified that at all times he dealt solely with Frank Kohnke, and never saw nor even heard of Delmar or Lois Kohnke. Delmar Kohnke testified that although he discussed the purchase of the 1965 Cadillac with "a man" from Metropolitan, his brother Frank transacted all the business with respect to the actual purchase.

17. After the accident of June 21, 1965, Frank Kohnke told two investigating officers at the hospital that he owned the car but that it was titled in his brother Delmar's name "for insurance purposes." Both officers so

testified at trial. The official report on file with the sheriff's department indicates the same (Exhibit 46).

18. On July 12, 1965, Delmar Kohnke was paid $5,000 by check issued to him and his attorney (Exhibit 54), for the loss of the 1965 Cadillac convertible. This check was sent before Badger State had reason to investigate.

19. On August 13, 1965, Frank Kohnke purchased a 1965 Pontiac Bonneville convertible from Tolkan Pontiac, Inc., in Milwaukee (Exhibit 78), which was financed by GMAC (Exhibit 51). The net balance, which was also the net amount of the original contract, was paid in a lump sum on November 4, 1965 (also see Exhibit 51).

Frank Kohnke testified that he could not remember where he got the money to pay off his loan.

This 1965 Pontiac was insured by Dairyland Insurance Company (Exhibit 66). Frank Kohnke was the insured, and identified as the owner and driver; his occupation as tavern owner.

20. On October 25, 1967, Frank Kohnke bought a 1968 Cadillac from King Cadillac, Inc., in Milwaukee (Exhibit 61), financed by GMAC (Exhibit 52). The entire net balance, which was the net amount of the original contract, was paid in a lump sum on January 19, 1968 (Exhibit 52). This automobile was titled in his wife's name (Exhibit 85), Frank Kohnke testifying that it was a gift to his wife.

21. Delmar Kohnke was employed by American Motors. Prior to his purchase of a new 1964 Rambler in late 1963, he had never owned a new car; he owned several old cars. He still owed $1,300 on the 1964 Rambler when the 1965 Cadillac was purchased. After the loss of the 1965 Cadillac in the accident of June 21, 1965, he owned several older cars, all of which were junked by him.

The title to the 1964 Rambler was transferred to his wife's name after the accident because, as a result of the accident and the question of coverage, he was not permitted to own a car.

22. With respect to the purchase of the 1965 Cadillac, Delmar Kohnke testified as follows:

He owned the 1962 Cadillac which was traded in on the 1965 Cadillac; he paid an additional $600–$800 in cash which he had in his house. The rest of the money came from Frank Kohnke who owed him money from the time they were in the tavern business together.

On cross-examination, portions of his deposition taken under oath on September 16, 1966, were read into the record. He stated therein that he did not trade in the 1962 Cadillac, that he thought one might have been traded in and that *it was not his car*. Further, a copy of a signed statement (Exhibit 4) given by Delmar Kohnke to Ralph Newman, a claims representative of Badger State, at Newman's home on September 2, 1965, was read into the record to the effect that Delmar Kohnke had paid cash for the 1965 Cadillac and had no trade-in. Delmar Kohnke then admitted leaving Newman's home for awhile after Newman had written a page or so "to get some documents."

Page seven of the statement (Exhibit 4) was read into the record to the effect that he owned the 1965 Cadillac and Frank used it seldom but by permission only; that he did not know if Frank Kohnke traded a 1962 Cadillac in on the 1965, since Frank was always changing cars; and *that he (Delmar) had only the 1964 Rambler* at the time the 1965 Cadillac was acquired.

There were other inconsistencies between Delmar Kohnke's testimony, his deposition, and the signed statement; *e.g.*, where he was when Frank first brought him the 1965 Cadillac: testimony—at home or by the tavern couldn't recall for sure, and on the same day as the purchase; deposition—at the tavern, couldn't recall when; statement—at home, "couple of days" after the sale.

As part of the rebuttal, Frank Kohnke testified that he did not tell his brother he borrowed money on the 1965 Cadillac. He then produced a "car invoice" from Metro-

politan Cadillac dated January 16, 1965 (Exhibit 59), which indicated a 1965 Cadillac had been delivered to Frank Kohnke and "Delmar C. Kohnke."

An analysis of this document indicates it has been tampered with: (1) the name Delmar Kohnke is out of line horizontally with the name Frank Kohnke; (2) the name of Delmar Kohnke seems to be fitted in an available space, and not too comfortably; (3) an address accompanies the name Frank Kohnke, but not that of Delmar Kohnke; (4) there is no period after the middle initial "C"; and (5) *the carbon copy of this document (Exhibit 24), introduced days earlier by Badger State from the files of Metropolitan Cadillac, bears only the name Frank Kohnke.*

From the total evidence we have no hesitation in determining that Delmar Kohnke did make false representations as alleged by Badger State. The documentary and testimonial evidence is hardly controverted by the contradictory and patently incredible testimony of Frank and Delmar Kohnke. Our analysis of the evidence establishes the following additional pertinent points with respect to the element of materiality of these false representations.

1. Ohio Casualty issued a policy to John Kohnke (although Frank Kohnke procured the insurance and was the principal driver) on the 1962 Cadillac. This insurance was cancelled because Frank Kohnke was a part-time bartender (Exhibit 60).

2. Continental National American Group issued a policy to Frank Kohnke on the 1962 Cadillac, which policy was also later cancelled because of his arrests (Exhibits 56, 57).

3. In his uncontroverted testimony, Charles R. Ewert, vice-president in charge of underwriting at Badger State testified:

a. That in writing the coverage on the 1962 and 1965 Cadillacs the company relied on the information supplied

them to the effect that Delmar Kohnke was the owner of both cars, and that he and his wife were the principal drivers thereof, since in writing insurance the company is primarily interested in the "operation and control of the vehicle" (who are the principal drivers), the ownership, and the use;

b. That had he, in January of 1965, had the information about Frank Kohnke that was then available, the company would not have issued coverage to Frank Kohnke on the 1965 Cadillac; similarly with respect to coverage on the 1962 Cadillac back in November of 1964;

c. Nor to Delmar Kohnke on the 1962 Cadillac in November, 1964, or on the 1965 Cadillac in January of 1965, if Delmar Kohnke had told the company that Frank Kohnke was (1) the owner of either car, or (2) would be the principal driver of either car;

d. That the reasons therefor were: (1) Frank Kohnke was previously cancelled by other companies, making him ineligible for coverage with Badger State under existing company policy; (2) he was employed as a bartender, also making him ineligible under the company policy at that time; (3) earlier applications for coverage of Frank Kohnke with Badger State were rejected and a "prohibited card" (Exhibit 71) placed in the company files stating the reasons therefor: "part time bartender, divorced two times arrested on aggravated battery charge;" the fact that Frank Kohnke was the owner or principal driver would be enough to increase the underwriting risk.

Although Frank Kohnke introduced documentary evidence that the criminal charges against him had been dismissed (Exhibits 81, 82) the arrests were enough to bring cancellation by the companies.

4. Testimony of Edward A. Gorman (Frank Kohnke's insurance agent at the time of the trial) was offered by respondent in rebuttal, that although he was able to secure coverage for Frank Kohnke on his 1965 Pontiac and

1968 Cadillac with Dairyland Insurance Company, a standard risk company (see also Exhibits 66, 67):

a. Frank Kohnke was denied coverage by Employers of Des Moines;

b. Frank Kohnke's Hartford policy (Exhibit 72), which had been in force for one month at the time of trial had been issued subject to an investigation of the company, which investigation would ordinarily take *two* months, so the agent could not state what the results of the investigation, or the company's action based thereon, would be.

c. The agent had been doing business with Frank Kohnke since November, 1966, but had been unable, prior to October 1968, to insure Frank Kohnke with a standard risk company for automobile liability insurance;

d. He also stated that the *titled* owner was of little significance in writing the insurance. (This corroborates the testimony of Badger State's vice-president in charge of underwriting, Charles Ewert.)

The deposition of John Kohnke, father of Delmar and Frank Kohnke, which was taken by Badger State, was read into the record by respondent as rebuttal evidence, and should also be noted to make our analysis of the evidence complete. In effect, he stated that he owned a 1962 Cadillac which Delmar drove most of the time and he "let Delmar have that car." He also testified that he selected and purchased the car himself, made a cash down payment and met the subsequent finance payments himself; Franke Kohnke made at most one or two payments, and did not use the car much; that Delmar used it most of the time.

This testimony is contradicted in great part by documentary evidence: (1) that John Kohnke had an insurance policy with Ohio Casualty with Frank Kohnke as principal driver (Exhibit 60), which was cancelled; (2) that Frank Kohnke purchased and financed the 1962 Cadillac with GMAC (Exhibit 50); (3) that the balance

owed was paid off by part of the loan Frank Kohnke obtained from Allen-Bradley (Exhibits 50, 58B) ; (4) that "Frank and John Kohnke" applied for insurance with Badger State, were refused, and a "prohibited card" was placed in the company's files (Exhibit 71).

The only evidence presented by Badger State which was disputed in any way by respondent is the testimony of Micheal Durante, Delmar Kohnke's insurance agent who handled the insurance on both the 1962 and 1965 Cadillacs. An analysis of the conflicting evidence regarding the transactions indicates the conflict is over (1) whether Delmar Kohnke called Durante or went to his office; (2) whether he told Durante his father was dead or ill; (3) who called with regard to the change to the 1965 Cadillac.

All agree that Durante was told Delmar Kohnke owned the cars, and that he and/or his wife would be the principal drivers. All agree that Frank Kohnke was never mentioned, Delmar and Lois Kohnke testifying that Durante never asked. If Durante did not know Frank Kohnke or have any dealings with him, there would obviously be no reason for him to ask. There is no question that Delmar Kohnke was given a multiple-car rate, which required that the second car be owned and regularly operated by him and his wife only.

There is no evidence of a written application with respect to the 1962 or 1965 Cadillac, although an oral misrepresentation is sufficient to avoid coverage.[26] And, as has been noted:

"Misrepresentations which will void an automobile insurance policy need not be expressed but may be by way of a fraudulent concealment of material facts." [27]

[26] Sec. 209.06, Stats.

[27] 7 Blashfield, *Automobile Law & Practice* (3d ed.), p. 313, sec. 301.4.

"Where specific answers are sought by the insurance company in an application for a policy, the facts elicited thereby have been treated as material so as to justify avoidance of the policy if false. However, the inquiry directed to the insured must be reasonably designed to elicit from him information which he possesses material to the risk." [28]

Under the circumstances of this case, the application was oral; a full written application was not required to add a car or change the endorsement under a policy already in existence. The oral representations were in answer to questions designed to determine material acts, *i.e.*, ownership, use, and principal drivers.

We are satisfied, from the uncontroverted documentary evidence, that the materiality of the alleged false representations was established as a matter of law.

As far as the outcome of this case is concerned, any alleged error in the precise form of the single question asked on the coverage issue is of no consequence to the result. Some comments are nevertheless in order.

Badger State argues that the issues of (1) misrepresentation, (2) intent, and (3) materiality or increased risk should have been considered separately by the jury. At the trial Badger State requested the court to divide the jury inquiry into these separate questions although Badger State also urged that the latter two inquiries should be answered "Yes" by the court.

While rejecting this request of Badger State and submitting the single question, the court instructed the jury that in order to answer the question "Yes," they must find that the false statements were in fact made, and also that such statements were made with intent to deceive *or* that the matter misrepresented increased the risk.

Badger State now contends this was error, since the evidence establishes as a matter of law that the alleged

---

[28] *Id.* at pages 314, 315.

misrepresentations were material. As the question stood with the related jury instructions, if the jurors answered "No" one couldn't tell whether the jury had concluded that the alleged false representations were not made or whether the jury had concluded that although these false representations were made they were not material.

Respondent's *only* argument on this issue is that Badger State is precluded from raising this issue on appeal since it expressly acquiesced in the form of the verdict and failed to object when the court indicated how it would instruct the jury, or when the instruction was given.

Respondent's contentions are without merit and clearly contradicted by the record. Badger State requested the court to answer the questions "Yes" as a matter of law, and indicated that the jury should be instructed only on misrepresentation. The court also noted Badger State's objection on the matter. In addition, in its motions after verdict, Badger State requested the court to change the jury's answer on the verdict to "Yes," requested a judgment in its favor *"n. o. v.,"* and renewed its objections to the instruction. These motions were denied by the trial court on April 21, 1969, stating that the verdict and instructions were proper, that there were no prejudicial errors of law, and that the evidence supported the verdict.

We conclude, therefore, that it was erroneous for the trial court here to submit a single question on the coverage issue wherein the jury was asked to determine both factors: (1) the fact of false representations, and (2) materiality.

Because of our determination that as a matter of law the alleged false representations were made and that they were material, it is not necessary for us to consider the evidence questions raised by Badger State in connection with the conduct of the lengthy coverage trial.

We conclude that the answer to the single jury question on coverage should have been changed by the trial court from "No" to "Yes" and judgments entered accordingly for Badger State.

*By the Court.*—Judgments to Suzanne Felde Peil, Larry W. Melcher and Kathleen Star Darga, Gerald T. Peil and Frank E. Kohnke, affirmed as to liability and damages; all judgments reversed as to coverage of Badger State; cause remanded for further proceedings not inconsistent with this opinion. Costs on case No. 201 to Suzanne Felde Peil and Badger State; costs on case No. 202 to Larry W. Melcher and Kathleen Star Darga and Badger State; costs on case No. 203 to Gerald T. Peil and Badger State; costs on case No. 204 to Badger State; costs to Badger State on the coverage issue in cases Nos. 201, 202, 203, 204, all prorated on the basis of 17 pages of brief plus 42 pages of appendix; Badger State costs to be charged equally against respondent Frank E. Kohnke and General Casualty.